# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

CEDRIC JEROME JOHNSON,
Defendant and Appellant.

S075727

Los Angeles County Superior Court
TA037977

December 27, 2018

Justice Cuéllar authored the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu, Kruger, and Raye[*] concurred.

---

[*]     Administrative Presiding Justice of the Court of Appeal, Thirds Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. JOHNSON

S075727


Opinion of the Court by Cuéllar, J.


On November 25, 1998, a Los Angeles County jury convicted defendant Cedric Jerome Johnson of the first degree murders of Gregory Hightower and Lawrence Faggins, and found true the multiple-murder special circumstance, arming, and personal use of a firearm allegations. (Pen. Code, §§ 187, subd. (a), 189, 190.2, subd. (a)(3); *id*., former §§ 12022, subd. (a)(1), 12022.5, subd. (a); all further undesignated statutory references are to this code.) Following the penalty phase trial, the jury returned a verdict of death. This appeal is automatic. (§ 1239, subd. (b).)

Many of defendant's claims in this appeal relate to the consequences of his disruptive behavior during the proceedings. One such consequence was his absence from the trial. As described in detail below, defendant's conduct conveyed a disregard for courtroom norms as persistent as it was severe. Beginning with his first trial on these charges, which ended in a hung jury, defendant unleashed profanity-laced tirades and accusations of racism against a number of different judges. He also expressed his dissatisfaction with his attorney, Steven K. Hauser, by repeatedly spitting on him and threatening to kill him and his family. Based on his own observations of defendant's behavior and reports of defendant's behavior in prior proceedings, Judge Jack W. Morgan ordered defendant to wear a stun belt in the courtroom. During jury selection at the first trial, defendant called Hauser names and threatened to

1

beat him up. He also repeatedly interrupted the proceedings. Because the jury was unable to reach a verdict as to either count of murder — the jury was evenly divided as to the Hightower murder, and voted 11 to 1 for guilt of the Faggins murder — the court declared a mistrial.

When proceedings resumed, so did defendant's disruptive behavior. Once again, defendant interrupted the court, spouted profanity, and spit on Hauser. Then, as the court, counsel, and defendant convened in the jury assembly room with the venire for the retrial, defendant suddenly attacked Hauser, striking him on the head and knocking him out of his chair. Defendant could not be controlled with the stun belt and was subdued only with the assistance of several deputy sheriffs. After dismissing the venire, the trial court barred defendant from the courtroom for the rest of the proceedings. Defendant declined to listen to the proceedings from his lockup cell using a speaker. When defendant returned to the courtroom for sentencing, defendant taunted and threatened the court and the attorneys: "What you gon' do when I get out? [¶] You and I both all know I'm getting out. [¶] All you lawyers."

At various points, the judges presiding over the proceedings expressed concern that defendant sought to inject error into the trial through his disruptive behavior. Not surprisingly, defendant now alleges error arising from the trial court's efforts to manage his behavior, including the decision to bar him from trial and the finding that he forfeited his right to testify. What we conclude is that defendant's repeated efforts to compromise the integrity of a capital trial were unsuccessful. In each instance where the trial court made decisions now challenged by the defendant, the court acted within the permissible scope of its discretion.

2

With respect to defendant's other claims, we find the trial court either did not err or did not cause prejudice to defendant. So we affirm the judgment in its entirety.

# I.

The Los Angeles County District Attorney charged defendant Johnson and codefendant Terry Betton with the murders of Hightower and Faggins. The first trial ended in a mistrial after the jury deadlocked on all charges. At the second trial, the jury convicted defendant of both murders and sentenced him to death. The jury also convicted codefendant Betton of Faggins's murder but deadlocked as to Hightower's. Betton was sentenced to an indeterminate life term for the murder, and that judgment was affirmed by the Court of Appeal (*People v. Betton* (July 12, 2000, B130960) [nonpub. opn.].)

## A. Guilt Phase

On the night of September 26, 1996, Shetema White threw a party at her Jordan Downs apartment in Watts to celebrate her brother's release from custody. Faggins and Hightower attended the party. But Faggins had reportedly "snitched" on someone known as "Mo-C." Many people at the party warned Faggins he was in danger and suggested he leave.

Their advice was sound. Defendant was in a nearby apartment with codefendant and Tyrone Newton. They had a view of Hightower and Faggins at the party. Defendant said, "You know we can do them right here and right now." When defendant asked Newton whether he would kill Hightower, Newton said, "he ain't did nothing to me." "It ain't the fact he did something to you," defendant explained, "we're getting rid of all the snitches."

Sometime before 10:00 p.m., after being at the party for 20 to 30 minutes, Charles "Pirate" Lewis told Hightower "something just doesn't feel right" and suggested they leave. Hightower got into the driver's seat of his girlfriend's car; Lewis got in the passenger seat. Robert Huggins (Hightower's half-brother) got into his own car; he was going to join them at Hightower's house. Faggins left the party around the same time. Around 40 to 50 people from the party were outside.

Newton went outside to smoke a cigarette. As he saw defendant come out of the apartment, Newton felt his own heart racing and wondered whether defendant could "really do this." Defendant approached Faggins with a gun and fired, hitting him in the shoulder. Faggins took off running. As Faggins ran between Huggins's car and a van, defendant continued shooting. When defendant stopped shooting, codefendant started shooting; defendant then resumed shooting. Defendant had a handgun (perhaps a Beretta) and a fully automatic Uzi. Codefendant had a handgun in each hand. Faggins fell when defendant sprayed him with bullets from the Uzi.

Lewis had already exited Hightower's girlfriend's car. As defendant and codefendant were walking back to the party, Lewis was moving a bicycle that happened to be in the car's way. According to Huggins and Newton, defendant approached the driver's side of the car and fired several times. Newton reported that defendant reached into the car with his gun; Huggins, on the other hand, said that defendant and the gun remained outside the car the whole time. Neither one saw codefendant fire at Hightower.

Leonard Greer was a few apartment buildings away when he heard the gunfire. He ran to see what had happened and

came upon defendant and codefendant, who were running away. Defendant had what appeared to be a gun in his hand. A short time later, Greer saw his sister, Rochelle Johnson (no relation to defendant), walking towards him. She was crying and covered in blood. She said, "They didn't have to kill him. C.J. [defendant] didn't have to kill him." Together they walked to Rochelle's apartment. Their mother, Annette Johnson, arrived about 10 minutes later.

The foregoing account of the homicides came primarily from the statements of Greer, Huggins, and Newton. But each had also made statements tending to undermine their accounts of what happened.

At trial, Newton denied hearing defendant talk about killing snitches in general or these victims in particular. He likewise denied knowing about any disagreements between defendant (or codefendant) and the victims. Newton's contrary statements came from a videotaped interview with Los Angeles Police Detective Chris Waters while Newton was in custody for possessing cocaine. The videotaped interview, which occurred two weeks after the murders, was shown to the jury. At trial Newton disavowed his prior statements. He testified initially that he was intoxicated during the interview and did not know why he supplied the false information. He subsequently testified that he made those statements because he "got caught with something"; the arresting officer offered to "drop my case" in exchange for information about the murders; and he just "followed along with" what the officer was saying. Both victims were friends of his, as were defendant and codefendant.

During the videotaped interview with Waters, Newton identified defendant as the shooter of both victims and said

defendant had used the same gun for each murder. At trial, though, Newton denied being at White's party and claimed he had been at home in Hawthorne with family the whole time. He denied talking about the incident with Huggins or Greer when he saw them about a week later, or with defendant and codefendant at any time. Newton insisted at trial that he did not know where or when the victims were shot; he had told Waters the shootings occurred around 4:00 or 5:00 p.m. on September 25, the day before they actually occurred. During the interview, he told Detective Waters that he had previously provided information to the police and had received benefits for his information. At trial, Newton admitted that he was released a short time after making his videotaped statement and was never prosecuted for the cocaine possession. Detective Waters confirmed that Newton said something like "the more y'all get me off y'all line, the happier I will be," but testified that she had not promised Newton anything in exchange for his statements.

During the interview, Newton also expressed reluctance to testify at any future trial. He stated that he had "too many family in the projects" and did not want them to "die[] over me, man." He also claimed he himself would "be a dead victim if I get on that stand and tell you everything I'm telling you, and he's sitting there watching me." Newton added, "I'll be dead. I'll be a dead man walking. I might as well just go on and blow my head off. Once I get through telling everybody about him, I might as well go home and kill myself, 'cause I ain't gonna survive. . . . I don't want to be on no stand on nobody. That's the one thing I don't want to do. . . . I will not — never be — I will never get in court on this thing, 'cause I know his people be in the courtroom." At trial, Newton explained that he wouldn't

be labeled a "snitch" because his prior statement inculpating defendant and codefendant "was a lie."

Huggins, for his part, spoke with Detective James Vena about defendant's role in these murders during an in-custody interview in December 1996. He addressed defendant's role in the murders again at trial. Huggins believed defendant had used an Uzi and a nine-millimeter Beretta, and that codefendant had used one or two nine millimeters. Huggins had earlier told Vena that Faggins dropped his gun — possibly a .380 or an Uzi — while running from defendant, and that defendant picked it up and used it to shoot at Faggins. But at the preliminary hearing in this case, he said he could not see the shootings because it was dark. At trial, Huggins explained the discrepancy by pointing out that at the time of the preliminary hearing he had been placed in a lockup cell with defendant and codefendant; that defendant had asked him, in front of codefendant and two dozen other inmates, "why'd I [Huggins] say all the stuff I said about him"; that Huggins became afraid for his safety; that he had asked to see the deputy district attorney before court that day, where he stated that he did not want to testify until he got out of jail; and that he did not testify truthfully at the preliminary hearing because he feared being labeled a "snitch." Huggins said he did not volunteer the information about defendant's involvement in the shootings earlier because defendant "was still running around on the streets." Indeed, defendant asked Huggins the morning after the murders whether he believed defendant had shot Huggins's brother. Huggins said nothing and walked away. Huggins did not see Newton or Greer that night, but noted there were a lot of people at the party.

Greer had previously been convicted of numerous felonies. He admitted that during a conversation with Detective Vena in March 1997 he had falsely claimed to have witnessed the shooting himself. He also falsely stated that the shootings were in retaliation for codefendant having been "beaten out of" some cocaine. Greer admitted that he "wanted to do something about this case." But after he learned that Detective Vena had played a recording of their conversation in court, he "feared for [his] life": "[O]n the street, I mean they already got me as a snitch. So that's being said in court that I'm testifying, when I told on C.J., that don't do nothing but put my life in danger." Greer testified at trial that he had told Officer Christian Mrakich what Rochelle said to him about the shooting, but Mrakich denied any such conversation occurred.

Other witnesses also offered testimony about the events that evening.

Lewis testified that he heard gunshots as he neared the bicycle blocking Hightower's girlfriend's car and immediately ducked down. He then heard more shots as he was about to get in the car, and instead took off running. He said he did not know who did the shooting. But Huggins testified at trial that he had spoken with Lewis shortly after the shooting. In that conversation, Lewis had said he heard Hightower ask defendant why he "was doing him [Faggins] like that out there in front of all them people" before defendant shot Hightower. Lewis testified at trial, though, that he did not see Huggins at all on the night of the shooting. While Lewis did see Huggins the next morning, he denied talking about what happened the night before.

Greer's sister, Rochelle, offered testimony favorable to the defense. So did their mother, Annette. Rochelle testified that she had been at the party, along with Hightower and Lewis. She did not see defendant or Faggins there. She said that codefendant, who was her boyfriend, stayed at home all evening with her four-year-old child. Rochelle testified that she had returned home, which was a couple of buildings away, when she heard screaming and then a pounding on her door. A woman told her there had been an accident. Rochelle, a nursing student, ran to offer help. She claimed codefendant stayed behind.

Rochelle found Hightower bleeding heavily. She tried to offer aid, but Hightower was unresponsive. Two other people put him in a car to take him to the hospital. When she got home, codefendant noticed the blood on her clothes and asked her what happened. Rochelle said there must have been a drive-by shooting, and called her mother to seek comfort. Annette arrived with Rochelle's brother, Leonard Greer. When Greer learned who had been shot, he said, "Oh, my God." Rochelle denied walking back with Greer to her apartment after the shooting, denied ever discussing with him what she saw or knew about the shooting, and denied saying anything to him about why it happened. Rochelle was aware that Greer was lying when he claimed to have seen the shootings and admitted that they had argued about his statements. Detective Vena heard Rochelle call Greer a "snitch" outside a courtroom during a prior proceeding in this case. Greer, too, testified that Rochelle had called him a "snitch" on that occasion. But Rochelle denied calling her brother that word.

Annette said she had wanted to go and comfort her daughter right away, yet it had taken her son over two hours to

come pick her up. Annette thought she heard codefendant's voice when she arrived at Rochelle's apartment, but did not see him. Rochelle did not tell Annette she had seen the shooting or knew who had done it. According to Huggins, Rochelle and Annette each told him, during the trial, something like, "They know who did it; why they still calling [me] to court?" Rochelle denied this.

A pathologist testified that Hightower suffered five gunshot wounds, all from a large caliber weapon such as a .45. He did not find any soot or stippling on Hightower's head or face. (One would expect to find stippling if the barrel of the gun had been as close to the victim as Newton described it.) Another pathologist testified that Faggins suffered four gunshot wounds from a .25-caliber weapon.

Police found 33 discharged cartridge cases at the scene from a variety of firearms. These included cases from a .380 (all fired from the same gun), a .45 (all fired from the same gun), and a nine millimeter (all fired from the same gun), as well as a lone cartridge case from a .25. A firearm examiner testified that an Uzi can fire nine-millimeter or .45-caliber bullets. But an Uzi (like most fully automatic weapons) typically leaves a characteristic mark in the shape of a quarter moon at the top of the shell — and no such markings appeared on the shells here. No guns related to the shooting were ever recovered.

Shetema White, the party's host, denied seeing defendant or codefendant that night. She did not recall hearing gunfire, either. Jocelyn Smith, who married defendant while he was awaiting trial, testified that defendant was home asleep around 7:30 or 8:00 p.m. on the night of the murders and that he was still asleep when she woke him and informed him that

Hightower and another person had been shot. He did not leave the apartment that night, to her knowledge. Jocelyn said that she visits defendant often and discusses the case with him. Her mother, Joyce Tolliver, testified that she saw two men walking by her door shortly after the shooting. The shorter one had a gun ("like a[n] Uzi") in his hand. Neither of the men was defendant or codefendant. Maureen Wallace, a neighbor, saw a couple of men running her way a minute or two after she heard the gunshots. One had a gun and the other had a dog on a leash, but neither was defendant or codefendant.

### B. Penalty Phase

The jury convicted defendant of both murders. The jury also found true the multiple-murder special circumstance as well as the allegations that defendant personally used a firearm and that a principal was armed with a firearm. At the penalty phase, the prosecution offered as evidence in aggravation two incidents: (1) defendant's conviction for selling marijuana in 1993; and (2) defendant's assault against his attorney on September 17, 1998, which occurred in the jury assembly room in front of 400 prospective jurors.

During the latter incident, defendant and codefendant were wearing remotely activated control technology (REACT) stun belts underneath their clothing. There were no visible restraints. The judge had just taken the podium to address the prospective jurors "when suddenly, and without any forewarning, defendant Johnson struck his attorney in the head." As defendant continued the attack, a sergeant in the deputy sheriff's department activated the REACT belt. When it did not appear to work, deputies attempted to restrain defendant directly. But defendant continued kicking at counsel

11

and spit at him. Defendant was ultimately subdued and handcuffed.

Hightower's father, Larry Hightower, testified that Hightower had managed to overcome his early criminal history. He graduated from high school, joined the staff of Congresswoman Maxine Waters, and ultimately opened his own business with the help of Waters, Jim Brown, and the Reverend Jesse Jackson. The business, The Playground, garnered national attention, and Hightower once hosted President Clinton there. Hightower also helped create a truce between gangs after the 1992 Watts riots.

Psychiatrist Marshall Cherkas testified that defendant was uncooperative when Cherkas sought to meet with defendant in jail. Even with a cursory (five-minute) examination, Cherkas could tell defendant suffered from psychosis with "some kind of a thinking disorder." Defendant's records indicated that he was violent and had problems with brain functioning.

## II.

### A. Barring Defendant from Trial Based on His Misconduct

Defendant had a long history of disruptive behavior during judicial proceedings and a fraught relationship with his attorney, Steven Hauser. In a previous prosecution for a different double homicide, the trial court eventually excluded defendant from the courtroom, and his attorneys "proceeded in

his absence."[1] On February 19, 1998, before the first trial in this prosecution (and while defendant was representing himself), Judge John J. Cheroske removed defendant from the courtroom because of his repeated outbursts. The proceedings resumed, with defendant present, a short time later. On March 5, 1998, after defendant's pro se status was revoked, he warned Judge Cheroske, "You can't stand up to me. My collateral attack against you will be unholy in this trial. Remember that." Defendant was again removed from the courtroom. On the way out, he called the court a "fucking racist" and "a Polack." After a brief recess, the court announced it had learned, through the bailiff, that defendant did not wish to return to court and had declined to listen to an audio feed of the proceedings. Defendant similarly refused to attend or listen to the proceedings at the next three hearings on April 7, 8, and 20, 1998, "if Mr. Hauser is his attorney." Defendant also refused to appear at a hearing before Judge Hom on April 22.

Later that day, with Judge Morgan presiding, Hauser announced that defendant was refusing to appear at trial until his pro se rights were restored. At a subsequent hearing on May 13, 1998, Hauser reported that defendant "cursed and spit" at him the last time they spoke, so Hauser requested that the bailiff be reassigned the task of inquiring whether defendant wanted to attend or listen to the proceedings. Defendant then agreed to return to court and was shackled. After the bailiff warned that defendant "may have a plan to do something" and the court ordered defendant wear a stun belt, defendant

---

[1] According to the prosecutor below — who had also prosecuted defendant on these earlier charges — the jury acquitted defendant of one count and deadlocked on the other.

vociferously objected, called Judge Morgan a racist, and cursed at the court. Defendant was again removed from the courtroom. Defendant later returned to court wearing a stun belt. He announced that "[m]y record will reflect that I do not use profane language in a court."

After the first jury trial ended in a deadlock, the parties convened for a status conference. Defendant began the hearing by spitting twice on his attorney and interrupting the court. When instructed not to speak "unless you raise your hand and I acknowledge you," defendant responded, "Fuck you and the staff. Fuck you and suck my dick." Defendant tried to exit the courtroom, but the court instructed the bailiff, "As many people you need, we'll keep him here. If you need more people here, that is fine." Defendant spit twice more on his attorney. As the court set forth its reasons for declining to reinstate defendant's pro se status — which included the observation that "this man is not capable of conducting his own trial. He would turn the trial into a total circus" — defendant warned the court, "I told you to suck my dick. Remove yourself from my court. Fuck yourself. Suck my dick. Suck my dick. Fuck your momma. You's a racist."

On August 25, 1998, when the parties convened to discuss the juror questionnaire, defendant reiterated his lack of faith in Hauser and claimed to be looking for private counsel. Jury selection was scheduled to begin on September 17, 1998.

Hauser was still representing defendant at the proceedings on September 17, 1998, which began in the courtroom. The plan was for everyone to go down to the jury assembly room, where the court would introduce the parties to the 400 prospective jurors, provide a time estimate and hand out

hardship questionnaires, and then proceed to a full introduction of the case and distribution of the general questionnaires. After Hauser objected to the bailiff's plan to place defendant in leg chains, Judge Cheroske ruled that defendant and codefendant would instead wear stun belts.

In the jury room shortly thereafter, as the clerk was asking the prospective jurors to rise and be sworn, defendant suddenly and violently attacked Hauser, striking him on the head. Defendant exclaimed, "That mother fucker. I don't want him. Mother fucker. Fucking ho (*sic*)." Deputy sheriffs rushed to restrain defendant, and Sergeant McLin instructed him to sit down. The stun belt was activated twice, but it had little or no effect. Defendant refused to cooperate, and it "took any number of deputy sheriffs to attempt to subdue him." Defendant complained, "Mother-fucker. Tried to dump me in trial. [¶] I don't want you. I do not want this man. He do not represent my interest, ladies and gentlemen. I'm qualified to represent myself. This man has intentionally dumped me in trial." The court adjourned, but defendant interjected, "They do a lot of illegal shit in these courtrooms" and attacked Hauser a second time. A deputy suffered a finger injury in the melee. Hauser suffered visible facial injuries and swelling. Afterwards, defendant bragged to the bailiff that he would attack Hauser again if given the opportunity.

Back in the courtroom, outside the presence of defendant and the prospective jurors, the court made a finding that defendant's actions were intentional and designed "for one more time to disrupt the proceedings and delay it." The court added, "He is out of control. I will not allow him back in this courtroom." The court allowed defendant to listen to the proceedings by way of a speaker in his cell if he so chose — and

defendant did not choose to do so — but concluded "there is no other possible solution to prevent such outbursts again." Back in the jury assembly room, over half of the prospective jurors indicated that defendant's unprovoked attack would prevent them from being fair jurors. The court accordingly dismissed the venire.

On September 21, 1998, defendant stated in no uncertain terms that he did not want to listen to the trial. Sergeant McLin also overheard defendant threaten Hauser: "I'm going to kill you and your family, you punk mother-fucker." The court noted for the record that defendant had repeatedly disrupted the hearing by banging or kicking on the bars of the adjacent lockup cell and making "extremely loud" noises.

At the hearing on October 2, 1998, the court noted that defendant, who was in the court building, had chosen not to listen to the proceedings and that he was no longer in the lockup cell "because of his repeated disruptions in the last proceeding by continually banging against the lockup door to the point where we could barely conduct court here."

At the next hearing, on October 19, 1998, the court found it "clear" that "despite any promises to the contrary, Mr. Johnson will continue to do any and everything possible to prevent the trial from proceeding." The court identified the following incidents as proof of defendant's unwillingness to correct his behavior: defendant's spitting on Hauser; defendant attacking Hauser in front of 400 prospective jurors; defendant continuing to attack Hauser despite activation of the stun belt, requiring six bailiffs to subdue him; defendant threatening to kill Hauser and his family upon learning that Hauser would not be relieved as counsel and that trial would not be delayed; and

defendant slamming the lockup doors and creating such a disturbance that it was difficult to hear in the courtroom. The court concluded, "I'm not going to have him in this courtroom no matter what he promises," since any promise to behave "would be simply a subterfuge to gain access to the courtroom and allow him to continue his offensive, violent and outrageous conduct." The court reiterated that defendant could choose to listen to an audio feed of the proceedings. It also ordered daily transcripts of the trial be made available to defendant.

Prior to voir dire, the court instructed the new venire that defendant "will not be present for these proceedings. The court is instructing [] that you are not to speculate as to the reasons for his absence, nor is this a matter which in any way can affect you or your verdict in this case." Over the course of the trial, defendant consistently declined to listen to the proceedings. Hauser sought to communicate with defendant "almost on a daily basis," but defendant refused to talk (or sometimes even to come to the attorney-client meeting room) and instead continued trying to spit on him. The bailiff once overheard defendant tell Hauser that he should have taken the opportunity "to slit your throat" in front of the 400 prospective jurors. The jury panel was instructed about defendant's absence as follows: "Defendant Cedric Johnson has voluntarily absented himself from these proceedings. This is a matter which must not in any way affect you in this case. [¶] In your deliberations, do not discuss or consider this subject. It must not in any way affect your verdict or findings you may be asked to make in connection with your verdicts." Neither side mentioned defendant's absence during argument.

After the jury found defendant guilty as charged, defendant continued "refus[ing] to leave his confinement cell."

During the penalty phase, defendant was asked to talk with Hauser about testifying. Defendant told jail personnel he didn't want anything to do with Hauser or the trial. Indeed, defendant refused to participate "in any way" when the jury returned its penalty verdict, even to watch the proceedings on closed-circuit television.

For sentencing, defendant came to court "in full restraints." Defendant addressed the court at some length. His contention was that he had tried to conduct himself "courteously and strictly by the law," but "[i]n return" had been "disrespected and penalized because of my abilities to comprehend and articulate the law." He claimed that the only reason Hauser refused to withdraw as counsel was "because his purpose on this case was to subvert and undermine. [¶] It got so, I started spitting in this man's face. I then physically attacked him, which never should have occurred. The court would like to switch the problem on me." After sentence was pronounced, defendant wondered aloud, "What you gon' do when I get out? [¶] You and I both all know I'm getting out. [¶] All you lawyers. [¶] Yeah."

### 1. The adequacy of the October 19, 1998, hearing barring defendant from the trial

At the hearing on October 19, 1998, the trial court described defendant's attack on Hauser in the jury assembly room, defendant's threats against Hauser and his family and his repeatedly spitting on Hauser, and defendant's disruptive behavior while in the lockup cell adjacent to the courtroom. Based on those incidents of misconduct, the court concluded that defendant — who was not present at the hearing — should be barred from the courtroom. The court conveyed that it would view any promise of good behavior by defendant as "a subterfuge

to gain access to the courtroom and allow him to continue his offensive, violent and outrageous conduct." At the same hearing, the court ordered that defendant be offered an audio feed of the proceedings and daily transcripts of the trial. Defendant claims the trial court erred in deciding to bar him from trial during a hearing at which he was not present.

A capital defendant has a federal constitutional right "to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure" (see *Kentucky v. Stincer* (1987) 482 U.S. 730, 745) and a state statutory right to be present at " 'critical proceedings.' " (*People v. Perry* (2006) 38 Cal.4th 302, 311; see §§ 977, 1043.) Under federal law, a capital defendant may voluntarily, knowingly, and intelligently waive the right to be present. (*People v. Davis* (2005) 36 Cal.4th 510, 531.) Under California law, a capital defendant may be absent from the courtroom for only two reasons: "(1) when he has been removed by the court for disruptive behavior under section 1043, subdivision (b)(1), and (2) when he voluntarily waives his rights pursuant to section 977, subdivision (b)(1)." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1210.)[2] The Attorney General does not claim defendant waived his right to be present, nor does any waiver appear in the record. But he does assert that defendant forfeited his state and federal right to be present by physically attacking his counsel and disrupting the proceedings.

---

[2] Even so, a capital defendant may not waive the right to be present at certain proceedings, including those portions of a trial in which evidence is taken before the trier of fact. (*People v. Jackson, supra,* 13 Cal.4th at pp. 1210-1211.)

We agree. In *Illinois v. Allen* (1970) 397 U.S. 337 (*Allen*), the high court "explicitly" held "that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." (*Id*. at p. 343.) Defendant complains he received no such warning from the judge prior to attacking counsel. But even if this is so, a warning is not a constitutional prerequisite to a forfeiture of the right to be present. Some misconduct, such as a violent assault in court, is so dangerous as to justify a defendant's removal even without a prior warning. (See *King v. Superior Court* (2003) 107 Cal.App.4th 929, 943 ["We read . . . *Allen* . . . to permit loss of a constitutional right in certain circumstances based on misconduct, even without a prior warning"]; accord, *Gilchrist v. O'Keefe* (2d Cir. 2001) 260 F.3d 87, 97; *People v. Wilkins* (N.Y.App.Div. 2006) 822 N.Y.S.2d 271, 272-273.) Because "dignity, order, and decorum" are essential to the administration of criminal justice, a trial court "must be given sufficient discretion to meet the circumstances of each case." (*Allen*, at p. 343.)

In this case, defendant physically assaulted counsel in full view of hundreds of witnesses. He refused to let up even when he was set upon by deputy sheriffs and his stun belt was activated, and managed to launch a second attack on counsel while swarmed by deputy sheriffs. Defendant visibly injured counsel and a deputy sheriff, and at no point in the proceedings expressed any contrition or remorse stemming from these attacks. The trial court could reasonably conclude that defendant's attack justified his exclusion from the courtroom,

even though he had not specifically been warned about the consequences of such conduct. (See *People v. Staffney* (Mich.Ct.App. 1990) 468 N.W.2d 238, 240 ["Defendant should not be permitted 'one free swing' at his attorney"].)

Nor was the trial court required to undertake a full evidentiary hearing, with notice to the defendant, an opportunity to present and cross-examine witnesses, and the appointment of new counsel, before making any ruling at the October 19 proceeding. Defendant's assault took place in open court, albeit while the court was convening in the jury assembly room, and was accompanied by profanity that was transcribed by the court reporter. (Cf. *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1032 ["The court properly found, based on its own observations, that Oliver was dangerous in the courtroom. It did not need to summon outside witnesses to resolve the shackling question"].) The trial court could, and in this case did, rely on its own observations of the events to determine that defendant was "out of control," that "his actions were intentional," and that "they were planned for one more time to try to disrupt the proceedings and delay [the trial]." (See *People v. Huggins* (2006) 38 Cal.4th 175, 202; cf. *U.S. v. Leggett* (3d Cir. 1998) 162 F.3d 237, 250 [upholding forfeiture of the right to counsel without an evidentiary hearing; "An evidentiary hearing was not necessary because Leggett assaulted [counsel] in full view of the district court"]; *State v. Lehman* (Minn.Ct.App. 2008) 749 N.W.2d 76, 81 [upholding forfeiture of the right to counsel, without an evidentiary hearing, where the defendant attacked counsel and punched him repeatedly; "various federal and state courts have . . . determined that the right to counsel can be summarily forfeited for extremely serious misconduct similar to that which occurred here"].)

Defendant contends an evidentiary hearing was required here because the trial court's ruling relied in part on defendant's threats against counsel and his family, which were uttered outside the court's presence. We disagree. Defendant's physical assault against counsel, followed by his repeated disruption of the subsequent hearing by banging on the metal door of his lockup cell, were sufficient in themselves to justify his exclusion from the courtroom. And defendant himself concedes that his attack on Hauser was "clearly the primary reason" for excluding him from the trial. Even if the trial court erred by considering defendant's threats against Hauser and his family in addition to the other instances of misconduct, the error was harmless under any standard. Before defendant ever uttered those threats, the court had already indicated that defendant would be excluded from the courtroom. Its ruling at that time was based on the attack and "the record," which was "replete with the outrageous conduct of Mr. Johnson." The court determined that defendant "is out of control. I will not allow him back in this courtroom." (See *State v. Lehman, supra,* 749 N.W.2d at pp. 85-86.) Moreover, nothing in the record tends to justify or mitigate any of defendant's misconduct, suggest that it did not occur, or indicate that a hearing would otherwise have been beneficial to defendant. (See *People v. Davis, supra,* 36 Cal.4th 510, 533; *People v. Douglas* (1990) 50 Cal.3d 468, 518; accord, *Jones v. Murphy* (2d Cir. 2012) 694 F.3d 225, 239 ["Any argument that Jones had a right to be present during the discussion of the consequences of his own violent and disruptive behavior would be circular, and would imply that a court could never exclude a defendant under *Allen*"]; *Campbell v. Rice* (9th Cir. 2005) 408 F.3d 1166, 1169, fn. 1, 1172-1173; *Diaz v. Castalan* (C.D.Cal. 2008) 625 F.Supp.2d 903, 921.) Indeed, the trial court

reasonably believed "that despite any promises to the contrary, Mr. Johnson will continue to do any and everything possible to prevent the trial from proceeding."

We likewise reject defendant's claim that the trial court was obligated to appoint new counsel to represent him at the October 19 hearing. Defendant relies on *King v. Superior Court*, *supra*, 107 Cal.App.4th 929, but that case is different in key respects. In *King*, the defendant had uttered threats and committed violence against a succession of appointed attorneys, culminating in a hearing at which the trial court determined that he had thereby forfeited his right to counsel. (*Id*. at pp. 934-936.) The Court of Appeal found the trial court erred by allowing the most recently appointed defense attorney, who had likewise been threatened by the defendant, to continue representing the defendant at the forfeiture hearing — but only because that attorney "violated the duty of loyalty by offering evidence of King's other violent behavior, evidence . . . obtained in his position as King's attorney" and "actively argued against him." (*Id*. at pp. 950, 949.) In this case, by contrast, Hauser did not disclose or volunteer any threats or misconduct by defendant, nor did he disclose privileged information he acquired in the course of the representation. To the contrary: Hauser consistently represented defendant's interests, despite defendant's hostility towards him. Even after defendant repeatedly spit on counsel in court, Hauser successfully objected to the proposal to bring defendant to the jury room in shackles. Following the attack, Hauser sought to minimize what had occurred and pledged that he could "represent Mr. Johnson with

equal vigor as if this had never happened."[3]  Because the trial court had no reason or basis to conclude that Hauser was unable to fulfill his duty of loyalty — and had no other indication that Hauser's ability to represent defendant was in any way impaired — the trial court could reasonably conclude that no actual conflict existed.  (See *People v. Roldan* (2005) 35 Cal.4th 646, 675; cf. *King,* at p. 950.)

### 2. *The decision to exclude defendant from the trial*

The exclusion of a capital defendant from his own trial is unusual, but not unprecedented.  We have previously upheld death judgments where the trial court excluded the defendant from part or most of a trial because of the defendant's disruption of the proceedings.  (See, e.g., *People v. Banks* (2014) 59 Cal.4th 1113, 1178-1181 [defendant was excluded from the entire penalty trial]; *People v. Welch* (1999) 20 Cal.4th 701, 773 [defendant was excluded "on a number of occasions"]; *People v. Medina* (1995) 11 Cal.4th 694, 735-740 [defendant was excluded from voir dire, presentation of the evidence, counsel's

---

[3]  Defendant contends that counsel acted against his interests when counsel opined in court that defendant's attack and his other outbursts were "merely a tool to either delay the trial or to eventually wind up defending himself, which I believe is what his goal is."  But counsel's statement was made at a *subsequent* hearing, *after* the court had already decided to exclude defendant from the trial.  Moreover, Hauser made the statement in the course of explaining why he was not declaring a conflict with his client, despite the prosecutor's intention to use the assault as evidence in aggravation in a potential penalty trial, and not to disparage defendant.  Finally, Hauser's characterization merely echoed the finding the court itself had made at the earlier hearing:  "I suspect that [defendant's actions] were planned for one more time to try to disrupt the proceedings and delay it."

arguments, and reading of the jury instructions].) A disruptive defendant forfeits any constitutional and statutory rights to be present at trial. (*Medina,* at p. 738.) In egregious circumstances, that forfeiture may encompass the remainder of the trial.

What justifies barring a defendant from the trial, after all, is the defendant's insistence on misconduct "so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." (*Allen, supra,* 397 U.S. at p. 343.) Whether it makes sense to expect a defendant in a given case, once removed from the trial, to actually abandon a strategy of disruption and conform to courtroom decorum if allowed to return depends to a large extent on nuanced assessment of the severity and persistence of the disruptive conduct. The trial court is best situated to evaluate the defendant's conduct and the likelihood of further disruption. Which is why it makes sense for the decision to bar a defendant from the remainder of a trial to rest within the broad discretion of the trial court. (See *People v. Welch, supra,* 20 Cal.4th at p. 773 ["appellate courts must give considerable deference to the trial court's judgment as to when disruption has occurred or may reasonably be anticipated"].)

The defendant in this case violently attacked his attorney, in full view of the court and the prospective jurors. He did so while wearing a stun belt meant to control him in case it was needed. The attack was preceded by regular, repeated, and vulgar disparagement of his attorney, including cursing and spitting, as well as numerous epithets directed at the court and other outbursts. At subsequent hearings, when defendant was in the lockup adjacent to the courtroom, he continued his efforts to disrupt the proceedings by banging or kicking the cell door.

So by the time the trial court barred defendant from the remainder of the trial during the October 19, 1988, hearing, it had ample reason to believe that defendant's desire to disrupt and delay the proceedings would not abate: "I'm not going to have him in this courtroom no matter what he promises," since any promise to behave "would be simply a subterfuge to gain access to the courtroom and allow him to continue his offensive, violent and outrageous conduct."

Defendant faults the court for failing to warn him that an assault against his attorney could specifically lead to his *permanent* expulsion from the trial. We disagree. Defendant was already aware that continued misconduct could result in his removal, given that the trial court had removed him from the courtroom based on his outbursts during his first trial. (See *People v. Sully* (1991) 53 Cal.3d 1195, 1240; cf. *People v. Medina*, *supra*, 11 Cal.4th at p. 731 [defendant's outburst in a prior trial in a different county justified shackling].) Defendant had no statutory or constitutional right to an estimate of how long he might be barred from the courtroom if his misconduct were to escalate. After all, the duration of his removal from the courtroom depended on the trial court's assessment of whether and when he would no longer pose a threat to the court or the proceedings. In any event, defendant cites no authority suggesting that a court must explicitly put a defendant on notice that violence against an attorney — or anyone else in the courtroom — could result in his removal. (See *Com. v. Scionti* (Mass.App.Ct. 2012) 962 N.E.2d 190, 200 [upholding defendant's removal without a warning where the defendant threatened violence if brought into the courtroom]; *People v. Staffney*, *supra*, 468 N.W.2d at p. 240; *People v. Wilkins*, *supra*, 822 N.Y.S.2d at pp. 272-273.)

The trial court in this case found that defendant posed a continuing threat. Defendant's conduct at trial leaves no doubt about why the court made this decision. A court need not engage in the empty ritual of periodically inquiring whether a defendant is willing to correct his behavior once it has reasonably determined that the defendant cannot be trusted to do so. (See *Com. v. Scionti, supra*, 962 N.E.2d at p. 200 ["If, in the alternative, she had ordered the defendant to be brought into court to receive an express warning, the safety of the defendant as well as court staff would have been at risk"].) Defendant cites no authority to suggest that a trial court lacks the power to deploy tools useful in confronting violent conduct. Nor does he explain why the court is bound to offer a dangerous defendant repeated — indeed, effectively unlimited — opportunities to inflict physical injury on counsel or others in the courtroom. (See *People v. Majors* (1998) 18 Cal.4th 385, 415 [" 'The trial court's ability to remove a disruptive or potentially disruptive defendant follows not only from section 1043, subdivision (b)(1), but also from the trial court's inherent power to establish order in its courtroom' "].)

In any event, defendant repeatedly manifested his lack of interest in the trial itself. He refused daily invitations to listen to the proceedings,[4] and demonstrated his unwillingness to conform to courtroom decorum by his continued misbehavior. On November 9, 1998, defendant attempted to spit on Hauser, and three days later, he refused all contact with Hauser and said

---

[4] The trial court declined to offer defendant a video feed of the entire proceedings, observing that "we have no facilities for doing that." (Cf. *People v. Mayham* (2013) 212 Cal.App.4th 847, 856-857.)

if given the chance, "he would spit all over Mr. Hauser again." Later in the trial, defendant reportedly stated that he should have taken the opportunity in the jury assembly room to slit counsel's throat. And when the court conducted a video simulation to determine whether defendant would follow the ordinary rules for a witness's examination by counsel, defendant refused to follow the question-and-answer format. Instead, he accused the court, the prosecutor, and defense counsel of illegal conduct — including the presentation of false evidence, the withholding of exculpatory evidence, and "a concerted effort to intentionally dump me" — and was about to launch into profanity when the court cut off the audio. Defendant's assertion that he could have been trusted to correct his behavior is not supported by the record.

What defendant argues next is that the trial court should have considered alternatives to excluding him from the courtroom, such as allowing him to be present while bound and gagged. Not once did defendant ask the court to consider this alternative, so he has forfeited the claim. (See *People v. Banks*, *supra*, 59 Cal.4th at p. 1181.) Even if the claim had been preserved, we held in *Banks* that "a trial court does not commit constitutional error when it opts to exclude a defendant from the courtroom in response to 'extreme and aggravated' conduct, even when options such as shackling are also available." (*Ibid.*) Indeed, because defendant's assault on counsel had occurred while he was wearing a stun belt, the trial court lacked assurance that restraints would be effective. (See *Allen*, *supra*, 397 U.S. at p. 344; *State v. Jones* (Conn. 2007) 916 A.2d 17, 35-36.)

Defendant's final challenge to the court's removal order is a technical one. He contends the trial court overstepped its

bounds by barring him before his trial had even begun. He relies on section 1043, subdivision (b), which creates an exception to the requirement that a defendant be personally present at the trial only "after the trial has commenced in his presence." (Cf. *Smith v. Mann* (2d Cir. 1999) 173 F.3d 73, 76 ["nothing in the Constitution prohibits a trial from being commenced in the defendant's absence so long as the defendant knowingly and voluntarily waives his right to be present"].) He then points to dicta in *People v. Concepcion* (2008) 45 Cal.4th 77, 80, footnote 4, where we observed in passing that commencement of trial under section 1043 begins at least as early as jury selection. Defendant reasons that because jury selection did not begin until November 5, 1998, the trial court acted prematurely when it barred him from the trial.

Defendant misunderstands the timeline. The parties convened in the jury assembly room for jury selection on September 17, 1998. The court would have proceeded to consider hardships and pass out the general questionnaires, but was disrupted by defendant's attack on Hauser. When the court discovered that the prospective jurors were irrevocably tainted by defendant's misconduct, it dismissed the venire. (See *People v. Silva* (2001) 25 Cal.4th 345, 372-373; *People v. Mayfield* (1997) 14 Cal.4th 668, 722, fn. 7.) Because it would take at least three weeks to assemble another panel of 400 prospective jurors and the prosecutor declared a scheduling conflict thereafter, the trial court found good cause to continue the trial until November. Consequently, the proceedings on November 5, 1998, were merely a continuation of the trial that had begun, for purposes of section 1043, on September 17, 1998. (See *People v. Granderson* (1998) 67 Cal.App.4th 703, 707.) In any event, the evident purpose of section 1043's requirement that trial have

commenced in the defendant's presence is to ensure that the defendant is aware of the right to be present and that the trial will continue in the defendant's absence. (See *People v. Ruiz* (2001) 92 Cal.App.4th 162, 168; accord, *Taylor v. United States* (1973) 414 U.S. 17, 20.) The record shows that defendant was assuredly aware of these things.

In short, the record supports the trial court's finding that defendant would not conform his conduct to the norms of a criminal trial. We therefore find, under the unusual circumstances presented, that the trial court did not err in excluding defendant from the courtroom for the entirety of his capital trial.

## B. Defendant's Forfeiture and Waiver of His Right To Testify

Defendant challenges the trial court's findings that he forfeited his right to testify at the guilt phase and waived that right at the penalty phase. The challenges lack merit.

### 1. *Guilt phase*

On November 17, 1998, during the guilt phase trial, the court discussed preparations for defendant's testimony. Defendant would not be allowed in the courtroom because of the security risks he posed, but would be allowed to testify "through a live TV audio transmission setup" from a secure interview room in the courthouse. Before granting defense counsel an opportunity to confer with defendant, the court directed counsel to tell his client "that he is to conform with the rules concerning testimony as any other witness"; that "[h]e will not be allowed to disregard such rules and use the opportunity to again attempt to disrupt the proceedings, delay the trial, or otherwise attempt to inject possible error into the proceedings"; and "that should

he fail to comply with these rules, it may be necessary, depending on the seriousness of his disruptions, to terminate the audio-video arrangement entirely, in which event his testimony will of course terminate." Counsel reported back that when asked whether he wanted to testify, defendant said he would refuse to answer counsel's questions. So the court asked defendant, through the live video feed, whether he wanted to testify. Defendant said that he did.

The court then reviewed the conditions for defendant's testimony: "You understand that if you testify, it's going to be a question and answer procedure. Mr. Hauser will ask the questions, and then you'll respond. [¶] Do you understand and agree?" Defendant replied, "Oh yes, we understand it. We know how the proceedings supposed to work, but it don't seem to be functioning well in this courthouse." To emphasize the point, the court reiterated that "[i]f we use this procedure tomorrow morning, once again, it will be question and answer by the lawyers; and you will simply follow the rules as any witness would in any other trial. [¶] Do you understand how that works?" The colloquy proceeded as follows:

"DEFENDANT JOHNSON: I think it's already error been injected into these proceedings. Lots of them. Lots of errors.

"THE COURT: Do you understand what I'm saying to you, sir?

"DEFENDANT JOHNSON: I hear what you saying.

"THE COURT: All right. Now, in the event that you don't follow the rules, if you try to use the opportunity to do the things I've just mentioned or engage in profanity, which you have done that enough times, I will then — I have here a master switch in front of me. I will kill both the audio and video portion. At that

point in time, you will be given a chance to reconsider your behavior.

"In the event that you don't want to conform, or if you say that you will and we reinstitute your testimony and you once again violate the rules, I want you to know right now that I would terminate any further testimony. You will have then voluntarily given up your right to testify in this trial by your own actions.

"Do you understand how this is going to work, sir?

"DEFENDANT JOHNSON: I understand y'all been violating rules in there.

"When did y'all start following rules in there?

"THE COURT: Do you understand what I'm saying, Mr. Johnson?

"DEFENDANT JOHNSON: I hear what you saying.

"THE COURT: Are you going to follow those rules?

"DEFENDANT JOHNSON: I'm going to do what I think is best on my own behalf.

"You know, if I write the rules — I understand you trying to set up criteria how you want me to operate.

"THE COURT: Do you understand what I said to you, sir?

"DEFENDANT JOHNSON: I understand what you would like me to do.

"THE COURT: It's not what I'd like you to do. It's what you will do, Mr. Johnson.

"DEFENDANT JOHNSON: I understand what you would like me to do, and there is no need for further discussion. Let's wait until tomorrow and see what's going to happen."

The court remained concerned whether defendant understood the ground rules for his testimony, so it tried once more:

"THE COURT: I want to know if you have any questions about what the rules are.

"DEFENDANT JOHNSON: No. No. There ain't no rules. Everything open in the courtroom. It ain't gonna get no rules until we get some attention to what's going on here.

"THE COURT: And will you be able to talk with Mr. Hauser tomorrow?

"DEFENDANT JOHNSON: "It ain't nothing to discuss with us.

"THE COURT: Well, you understand he's the one who is going to be asking you the questions?"

"DEFENDANT JOHNSON: It doesn't matter.

"THE COURT: Will you be able to answer his questions?

"DEFENDANT JOHNSON: It's irrelevant. We'll see what goes on tomorrow. Let's talk about it tomorrow.

"[¶] . . . . [¶]

"THE COURT: No, you listen to me once more. I don't want any questions about this. You will testify tomorrow and follow the rules as any other witness. If you violate those rules, you know right now I will terminate your testimony; and you will never have an opportunity to testify before the jury.

"It's your choice. You can testify or not testify. That's how it's going to work.

"And you have a nice day, Mr. Johnson.

"DEFENDANT JOHNSON: You, too."

Following this colloquy, counsel and the court remained concerned that defendant was not going to follow the rules. Counsel, who was opposed to defendant's decision to testify and feared the effect of his potential misbehavior on the jury, suggested "prior to him actually testifying, that we have a little test run, out of the presence of the jury, just to see if he is going to cooperate." The court agreed to do so. The next morning, the court made the following statement for the record: "Based on his disruptive record and upon yesterday's comments, 'we'll wait and see what will happen,' also based on Mr. Hauser's request for some sort of a test on how Mr. Johnson will behave in front of this jury, and also based on my concern as to what sort of damage, irreparable damage, Mr. Johnson might be able to cause at this, the end of our second jury trial, I'm going to do the following:

"The jury will not be present.

"The bailiffs will tell Mr. Johnson that he's about to be on the hookup.

"I will activate the TV audio system.

"I will then tell Mr. Hauser to call his next witness. He will call Mr. Johnson.

"I will administer the oath. And I will then tell Mr. Johnson that the attorneys will be questioning him.

"I'll ask each attorney to introduce themselves by their names so that he becomes familiar with the voice.

"And I will tell him then that Mr. Hauser is going to be then questioning him as his attorney.

"And then, Mr. Hauser, I'll ask you to pose the first question to him, which would be what?

"MR. HAUSER: I'll probably ask him where he was living on the date of September 26th.

"THE COURT: Based on whatever happens at that point in time, we'll make the decision as to whether the jury is going to be brought out and hear his testimony."

The clerk activated the video feed. After counsel called defendant, and defendant was sworn, the court asked counsel to begin questioning defendant. The exchange proceeded as follows:

"Q. Mr. Johnson, back on September 26th of 1996, where were you living?

"A. First of all, I wish to greet the jury.

"Good morning to y'all.

"And I apologize for not being able to be present at my own so-called trial, but it's beyond my control.

"First of all, you do not represent my interests and never have.

"And all three of you attorneys work together. Everything you got going is totally illegal, and I'm totally opposed to it.

"Q. Is that where you live?

"THE COURT: Did you hear the question?

"THE WITNESS: Excuse me?

"Q. BY MR. HAUSER: Where do you live?

"A. You do not represent my interests and never have.

"What y'all doing is illegal.

"You have never tried to do nothing to benefit me.

"Y'all all working together.

"I oppose what's going on.

"I'm not illiterate, neither am I dyfunctional (*sic*). It shouldn't be conducted this way.

"This is reasonable doubt, ladies and gentlemen, what's going on in this trial.

"Q. So you don't want to testify. Is that you're saying?

"A. You do not represent my — I would appreciate if y'all read that letter I filed to the court Monday as a form of protest to what's going on to the jury to let them know that I'm not fooled or blind to what's going on.

"This is a concerted effort to intentionally dump me in that courtroom, ladies and gentlemen. Consider that.

"Q. Mr. Johnson, this is your chance. Now, are you going to testify or not?

"A. You do not represent my interest and never have, Mr. Hauser. I do not need to talk to you.

"Q. Does that mean 'no'?

"A. You have not — what about the tapes and everything y'all have to show that these witnesses was lying.

"Y'all knew they was lying and tried to withhold that evidence. That's discriminatory in nature, and what y'all doing is a crime.

"Q. Are you going to answer my questions?

"A. Do you understand that you are committing a crime?

"You do not represent my interests and never have.

"THE COURT: All right. Mr. Johnson, I take it then by your comments that you do not intend to follow the normal

witness rules of question and answer, and you will continue to make these kind of comments.

"Is that what you're going to do?

"THE WITNESS: Yes, Judge Cheroske.

"THE COURT: Well, I have a little surprise for you, Mr. Johnson. The jury is not present. This was a test [to] see what kind of person you would be.

"You have proven by your conduct that you're not going to be able to testify in this case.

"THE WITNESS: That's right."

At that point, the court deactivated defendant's audio "because the profanity was about to begin" — and the trial judge had already witnessed the depth and breadth of defendant's distinctive talents in this area. The court reiterated that defendant had forfeited his right to testify by his conduct: "I don't know how we could have had any more conduct that would have been disruptive to these proceedings than what we've just witnessed."

We agree with the trial court: defendant forfeited his right to testify by his misconduct. The right to testify, like other constitutional rights such as the right to be present or the right to confront witnesses, can be forfeited by disorderly or disruptive behavior that causes the defendant to be barred from the courtroom. (*People v. Hayes* (1991) 229 Cal.App.3d 1226, 1233-1234; accord, *U.S. v. Nunez* (10th Cir. 1989) 877 F.2d 1475, 1478; *People v. Menner* (N.Y.App.Div. 2003) 769 N.Y.S.2d 569, 570; *State v. Mosley* (Tenn.Crim.App. 2005) 200 S.W.3d 624, 633-634; *State v. Chapple* (Wn. 2001) 36 P.3d 1025, 1033-1034; *State v. Anthony* (Wis. 2015) 860 N.W.2d 10, 22-25.) We

explained in part II.A., *ante*, that the trial court did not err in excluding defendant from the trial.

In this case, though, the trial court did more than simply rely on its prior determination that the trial could not proceed in defendant's presence. The trial court sought to accommodate its substantial and documented security concerns with defendant's constitutional right to testify by proposing that defendant testify via closed-circuit television. Defendant was informed repeatedly his testimony would proceed in a question and answer format. He was warned at length that his refusal to comply with that (and other) courtroom procedures would lead to termination of his testimony and forfeiture of his right to testify. The court did not succeed in securing defendant's agreement to abide by these ground rules — despite the court's best efforts. Instead of promising to behave, defendant candidly admitted, "I'm going to do what I think is best on my own behalf" and proposed everyone else "wait until tomorrow and see what's going to happen." When the court tried to probe further into defendant's willingness to follow the rules, defendant shot back, "There ain't no rules."

These responses proved unsettling to defense counsel, who feared that defendant's behavior would prejudice his chances with the jury. They were also unsettling to the court, who feared defendant was attempting to force a mistrial. Even though defendant had already forfeited his right to appear at trial — and even though defendant had failed to reassure the court that he would cooperate if granted the chance to testify remotely through video — the court agreed to offer defendant one more chance to show himself capable of testifying in an appropriate manner. It was defendant's own counsel who suggested the plan, which called for a dry run with the preliminaries of

defendant's testimony, outside the presence of the jury, to see how defendant was going to behave. Defendant immediately demonstrated his refusal to abide by the question and answer format. He purported to offer unsupported legal conclusions, referred to alleged facts not in evidence, and declined to actually answer any questions — save the court's inquiry whether defendant intended to continue disregarding the question and answer format and to continue offering improper and inadmissible opinions about the proceedings. To that question, defendant replied, "Yes, Judge Cheroske." Together, defendant's actions impelled the trial court to conclude that defendant had forfeited his right to testify by his misconduct. The trial court did not err in this conclusion. (See *State v. Anthony*, *supra*, 860 N.W.2d at pp. 24-29.) Defendant's claim to the contrary — that the trial court "should have given [him] another warning and chance to conform his behavior" — ignores the numerous warnings and chances he had already been given.

Defendant complains next that the trial court "misrepresented" whether the jury was present, thereby improperly inducing him to waive his Fifth Amendment privilege against self-incrimination. We find that defendant suffered no Fifth Amendment violation. None of the questions at the Evidence Code section 402 hearing sought answers that might tend to incriminate him (see *Hoffman v. United States* (1951) 341 U.S. 479, 486-487), nor were any of his nonresponsive statements ever used against him in the trial (see *Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, 1128). We likewise reject defendant's claim that defendant was denied due process by the trial court's failure to inform him of the jury's absence. Had the court allowed defendant to begin his testimony in front of the jury, the events all but certainly would have unfolded exactly as

they did: Defendant would have offered incompetent and unsupported legal conclusions, referred to alleged facts not in evidence, and declined to actually answer any questions — save the one in which he manifested his unwillingness to abide by the question and answer format — and the court would have terminated his testimony. The only difference is that the jury would have been witnesses to his disruptive conduct. It was not fundamentally unfair to prevent defendant from prejudicing his defense in this manner.

Nor can we embrace defendant's contention that new counsel ought to have been appointed because Hauser undermined his interests by cooperating with the "dry run" procedure. Hauser was legitimately concerned that defendant's antics would prejudice him in the jury's eyes — and defendant's scattershot accusations at the Evidence Code section 402 hearing, had they occurred before the jury, might well have done so. Hauser's efforts to protect defendant's right to a fair trial cannot reasonably be characterized as a breach of his duty of loyalty.

We disagree, too, that the trial court had an obligation to suggest that defendant's testimony from the prior trial be offered in lieu of defendant's live testimony. Defendant forfeited any claim about his prior testimony by failing to offer it in evidence below. (See Evid. Code, § 354.) Moreover, whether defendant's prior testimony would have been helpful to defendant was a question of strategy reserved to the defense. Even assuming that defendant's prior testimony would have been admissible, it was not a choice the trial court was required to make or speculate about.

## 2. *Penalty phase*

Near the end of the penalty phase, the prosecution asked whether the parties should revisit the issue of defendant's potential testimony via closed-circuit television. Counsel reiterated his desire that defendant not testify, and the court wondered whether there would be "the same type of reaction that we had from him when he thought a jury was here once before." The next day, the prosecutor asked for "some kind of statement, either on the record or through Mr. Hauser, with Mr. Johnson saying he would rather not testify or something to that effect." The court responded that "the only thing I can do is what I've done throughout the whole trial, is have the deputy take Mr. Hauser down to the holding area and see if . . . Mr. Johnson will come out of his cell and go into the interview room so he could communicate." The court refused to require Mr. Hauser "to approach Mr. Johnson in a noninterviewing area where there is [no] glass to protect him from whatever evils Mr. Johnson has intended for Mr. Hauser. I don't think he needs to go through that that many times." (The court was evidently referring to defendant's regular practice of spitting on his attorney.)

During a pause in the proceedings, defendant was asked whether he would be willing to talk with counsel about testifying. According to the bailiff, defendant told the sergeant that he did not want "anything to do with Mr. Hauser or anything to do with the trial." The trial court concluded, "Well, that answers that then."

We find no error. Because the record contained nothing to suggest that defendant disagreed with counsel's decision not to call him as a witness, the trial court had no obligation to advise defendant of his right to testify or elicit an express statement

confirming counsel's waiver of that right. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1332-1333.)

### C. Denial of Requests for New Counsel

On numerous occasions during defendant's first trial, the court facilitated discussions between defendant and Hauser about their relationship and encouraged defendant to talk with and listen to counsel. On a couple of those occasions, defendant requested new counsel be appointed on the ground that Hauser's performance was inadequate or that he and Hauser were in irreconcilable conflict, but those motions were denied. (See *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).) Defendant concedes that any error in failing to remove Hauser in those instances "was arguably rendered moot by the mistrial," and he does not challenge those rulings here. He claims instead that the trial court erred in denying what he characterizes as three separate *Marsden* motions following the declaration of a mistrial: on July 7, 1998; on July 14, 1998; and on September 17, 1998, when he attacked Hauser in the jury assembly room. We find no error because the record does not demonstrate that defendant ever made a *Marsden* motion on those dates.

The legal principles governing a *Marsden* motion are well settled. " ' "When a defendant seeks to discharge his appointed counsel and substitute another attorney, *and asserts inadequate representation*, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance." ' " (*People v. Vines* (2011) 51 Cal.4th 830, 878, italics added; cf. *People v. Wharton* (1991) 53 Cal.3d 522, 580 ["When the basis of a defendant's dissatisfaction with counsel is set forth in a letter of sufficient detail, however, a full-blown hearing is not

required"].) But the trial court has no sua sponte duty to inquire whether the defendant's desire to substitute another attorney is based on inadequate representation or an irreconcilable conflict. (See *People v. Sanchez* (2011) 53 Cal.4th 80, 89-90 ["a trial court is obligated to conduct a *Marsden* hearing on whether to discharge counsel for all purposes and appoint new counsel when a criminal defendant indicates after conviction a desire to withdraw his plea *on the ground that his current counsel provided ineffective assistance* [and] there is 'at least some clear indication by defendant' . . . that defendant 'wants a substitute attorney' " (italics added)].) So when a defendant asks for new counsel, a trial court's duty to undertake the *Marsden* inquiry "arises '*only when the defendant asserts directly or by implication* that his counsel's performance has been so inadequate as to deny him his constitutional right to effective counsel.' " (*People v. Leonard* (2000) 78 Cal.App.4th 776, 787; see *People v. Martinez* (2009) 47 Cal.4th 399, 421 ["we agree with the decisions of the Courts of Appeal holding specifically that the trial court is not required to conduct a *Marsden* hearing on its own motion" (citing *Leonard*)].)

Defendant did not assert inadequate performance, nor did he claim an irreconcilable conflict existed, as the basis for requesting new counsel directly or by implication at the proceedings on July 7 or July 14, 1998. At the hearing on July 7, which began with defendant spitting on his attorney and included his repeated outbursts and copious profanity and insults directed at the court, defendant said "Fuck you" and then said, "I ask that I be allowed another attorney." When the court responded, "I am not getting you another attorney," defendant replied, "I'll get me one." At another status conference the following week, defendant interrupted the court to announce he

"would like a continuance and another counsel. Under the Sixth Amendment —." The court said, "Denied," without specifying whether it was denying the motion on the ground that defendant had interrupted the court or was denying it as insufficient. In any event, though defendant did in the latter instance refer to a constitutional provision, he still failed to link his request to counsel's performance at that point or any earlier point in the proceedings.

Nor do we discern a valid request for substitute counsel on September 17, 1998, when defendant attacked Hauser in the jury assembly room. While defendant was being restrained by the deputies, defendant said, "That mother fucker. [¶] I don't want him. [¶] Mother fucker. [¶] Fucking ho (sic)." He also added: "I don't want you. [¶] I do not want this man. He do not represent my interest, ladies and gentlemen. [¶] I'm qualified to represent myself. [¶] This man has intentionally dumped me in trial." It does not appear that defendant was addressing the court; rather, he directed his comments at counsel and at the 400 prospective jurors in the room. Even if construed as a motion directed at the court, defendant never requested the appointment of *substitute* counsel. (See *People v. Clark* (1992) 3 Cal.4th 41, 103 (*Clark*) ["He never asked for appointment of substitute counsel, but only to discharge Keith"].)

Defendant, moreover, was well aware of how to trigger the *Marsden* inquiry. On May 13, 1998, during his first trial, defendant said, "I would ask for a *Marsden*," noting the "obvious conflict between Mr. Hauser and myself." On May 26, 1998, defendant complained of "irreceiveable [*sic*] differences. And nothing I can do could change this. [¶] I'd like him removed if possible" — although defendant conceded the very next day that

Hauser was competent. Defendant's comments in the three proceedings he has identified on appeal, by contrast, merely evidenced his displeasure with Hauser. (See *Clark, supra,* 3 Cal.4th at p. 103 ["Defendant's diatribes about Keith did not . . . constitute a *Marsden* motion"].) So even assuming defendant's violent conduct did not relieve the court of its duty to consider his comments, nothing he said triggered the court's obligation to undertake a *Marsden* inquiry.

We likewise reject defendant's claim that the trial court ought to have appointed new counsel on its own — notwithstanding defendant's failure to request new counsel or to justify such an appointment — on the ground that defendant could no longer get along with his attorney. (See *People v. Gay* (1990) 221 Cal.App.3d 1065, 1070 ["unless requested to do so by [the] defendant, the trial court has no statutory or inherent power to substitute appointed counsel, sua sponte, based on the judge's subjective opinion the attorney is incompetent"].) Nor may a defendant argue on appeal that the trial court ought to have discharged counsel for reasons that the defendant failed to make known to the trial court at the time of the proceedings. (See *People v. Abilez* (2007) 41 Cal.4th 472, 489.) A court would risk interfering with the attorney-client relationship if its responsibility to substitute counsel could be triggered by such a meager showing. (See *People v. Martinez, supra,* 47 Cal.4th at p. 420.)

Moreover, a defendant may not force the substitution of counsel by manufacturing a conflict or a breakdown in the relationship through his own conduct. (*People v. Hardy* (1992) 2 Cal.4th 86, 138; cf. *Daniels v. Woodford* (9th Cir. 2005) 428 F.3d 1181, 1197 [noting that "the conflict was not one created by Daniels or by his counsel"].) Here, it was defendant who

repeatedly spit on and unilaterally refused to cooperate or even speak with counsel — and who ultimately assaulted counsel in open court. A defendant cannot take such steps and then rely on that same behavior to assert an irreconcilable conflict with counsel. (See *People v. Crandell* (1988) 46 Cal.3d 833, 860.)

As it turned out, defendant's behavior at this trial confirmed the observation made by the trial court prior to the first trial, in addressing defendant's criticism of his attorney: "I have carefully observed this particular subject matter. And it is my considered opinion, after an extensive evaluation, that your only purpose is to try to build up a ground for appeal if you should be convicted in this case. And that is your entire purpose for carrying on this way. You have a competent, effective counsel. You have even acknowledged he was competent. I think you are simply trying to play games with this court. And I want that placed clearly in the record because I carefully observed that. And that is my considered evaluation of the matter. This is nothing more than gamesmanship by your trying to develop a ground or grounds for appellate lawyers and nothing else. And there is no substance, basis, or truth to it."

## D. Trial Court's Failure To Commence Competency Proceedings

Relying largely on the disruptive behavior outlined above, defendant contends the trial court erred in failing sua sponte to suspend the proceedings and hold a competency hearing. We conclude that the trial court did not abuse its discretion by failing to declare a doubt as to whether defendant was competent to stand trial.

A defendant is incompetent to stand trial when he or she lacks the ability to consult with defense counsel with a

reasonable degree of rational understanding or a rational and factual understanding of the proceedings. (*Dusky v. United States* (1960) 362 U.S. 402, 402; *People v. Mickel* (2016) 2 Cal.5th 181, 195; see § 1367, subd. (a).) A trial judge must suspend proceedings and hold a hearing "whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial." (*People v. Rogers* (2006) 39 Cal.4th 826, 847; see § 1368.) Unless the record contains substantial evidence of present mental incompetence, we review a trial court's failure to initiate the competency inquiry only for abuse of discretion. (*Mickel*, at p. 195.)

As defendant concedes, at no point did any mental health expert ever opine that defendant was *unable* to assist his attorney or understand the proceedings against him. Nor did counsel or the court ever suggest that was so. To the contrary: counsel believed that defendant was *not* incompetent. So defendant points instead to his repeated outbursts in court, his rocky relationship with counsel, and his eventual attack on counsel in the jury room. He asks us to infer that this misconduct must have been triggered by a mental disorder so severe that it disabled him from assisting counsel or aiding in his own defense. The record belies defendant's proffered inference.

Defendant's misconduct in court and his antipathy towards counsel began well before "the date the trial court barred [him] from the courtroom for the duration of his retrial" — which is the date defendant identifies as the trigger for his competency claim. In an earlier prosecution for a different crime, defendant was so disruptive that he was removed from the courtroom. He was again removed from the courtroom

before the first trial in this case. He repeatedly cursed both the court and his attorney and made threats against them. In addition to spitting on his attorney, he declared that he and his attorney were in irreconcilable conflict and several times demanded, without any basis, that new counsel be appointed. All of this misconduct — which prefigured the more aggravated misconduct that ultimately led to defendant's removal from the courtroom at his second trial — occurred at a time when defendant was nonetheless able to cooperate with counsel and, as defendant concedes on appeal, "testify effectively." And all of it occurred prior to the point at which defendant contends the trial court should have declared a doubt about his competency.

Defendant's disruptive and self-defeating behavior coexisted with his ability to assist counsel and participate effectively at the first trial. This fact strongly supports the conclusion that defendant's continued misconduct during the second trial was not evidence of incompetence. Rather, it was evidence that — in the words of one of the judges who "carefully observed this particular subject matter" at the first trial — he was "simply trying to play games with this court" and his "only purpose [was] to try to build up a ground for appeal if [he] should be convicted in this case." At the second trial, Judge Cheroske similarly believed that defendant wanted to return to the courtroom "for the sole purpose of engaging in more disruptive behavior." Because the trial judge is in the best position to assess the cause of such misconduct, we generally give "great deference" to the judge's decision whether to hold a competency hearing. (*People v. Marshall* (1997) 15 Cal.4th 1, 33.)

Defendant's unwillingness to cooperate with counsel does not demonstrate incompetence. (See *People v. Mendoza* (2016) 62 Cal.4th 856, 879.) Nor were defendant's courtroom outbursts

or other disruptive conduct necessarily an indicator that he was unable to understand the proceedings or assist in his defense. (See *People v. Mai* (2013) 57 Cal.4th 986, 1033.) And defendant's belief — even if sincere — that counsel was "in league with the prosecution" does not establish that the trial court abused its discretion in failing to order a competency hearing, either. (*People v. Welch*, *supra*, 20 Cal.4th at p. 742.)

Defendant directs our attention to a handful of federal appellate cases. We can distinguish them all. In each of them, evidence of the defendant's outbursts and disturbances was merely one factor among many that led to the conclusion that the trial court erred in failing to inquire into the defendant's competence. (See *U.S. v. Cornejo-Sandoval* (10th Cir. 2009) 564 F.3d 1225, 1235 ["certain extreme behavioral manifestations may, along with other factors, raise reasonable cause to doubt a defendant's competency"].) In *Torres v. Prunty* (9th Cir. 2000) 223 F.3d 1103, for example, a psychologist opined that Torres had a "severe" delusional disorder and "registered 'one of the most disturbed profiles . . . seen by this evaluator.' " (*Id*. at p. 1105.) After Torres withdrew his insanity plea over counsel's objection, counsel advised the court that Torres's paranoid delusions had expanded to include an elaborate conspiracy involving himself and the court. But, unlike here, counsel stated that he consequently had a doubt as to Torres's competency. (*Id*. at pp. 1106, 1108.) True: There is a slight similarity between the conspiracy described in *Torres* and defendant's asserted belief that counsel, the court, and the prosecutor were conspiring against him. But Torres had already been diagnosed as suffering from a severe psychiatric disorder, and the psychologist had in addition reported that Torres "was 'fully credible and not seeking consciously to deceive in any way.' "

(*Id.* at p. 1106; see *id.* at p. 1109 ["*In light of the previous medical evaluation* . . . , it was unreasonable for the court not to make a more complete inquiry into the nature of defense counsel's statement . . . ." (italics added)]; *Maxwell v. Roe* (9th Cir. 2010) 606 F.3d 561, 565 [the defendant "had a history of mental illness, frequently refused to take his prescribed antipsychotic medications, was unable to verbally or physically control himself in the courtroom, and exhibited increasingly paranoid and psychotic behavior that impaired his communication with defense counsel and reasoning regarding his defense"]; *id.* at p. 573 [the trial court failed to examine psychological reports at the time of trial stating that the defendant " 'is unable to function at this time because of his poor mental state' " and " 'is not oriented to time or place' "]; *U.S. v. Williams* (10th Cir. 1997) 113 F.3d 1155, 1160 [the defendant, who had a history of drug addiction, was alternately taking or refusing to take a psychotropic drug during trial, and was crying uncontrollably, "misapprehended her attorney's role"; in addition, she "cryptically answered" whether her medication interfered with her ability to communicate with counsel, and counsel wondered aloud "whether his client understood the proceedings"]; *Lafferty v. Cook* (10th Cir. 1991) 949 F.2d 1546, 1552-1556 [finding error where the four examiners employed by the state all agreed that the defendant was incompetent and the trial court misunderstood the applicable legal standard].)

By contrast, no evidence in the record here supports the conclusion that defendant's disruptive behavior was the product of a mental disorder. What ample evidence suggests instead is that he was malingering: Defendant selectively refused to cooperate with counsel before his first trial — and claimed that counsel and the court were part of a conspiracy against him —

*before* abruptly shifting strategies, cooperating with counsel, taking the stand in his own defense, and achieving the favorable outcome of a hung jury. (See *People v. Rogers*, *supra*, 39 Cal.4th at p. 849.) Because the record showed that defendant could communicate with and assist counsel when it suited him, the trial court was not obligated to institute competency proceedings when defendant resumed and escalated his oppositional behavior at the second trial.

Finally, we disagree that the trial court was obligated to suspend proceedings based on Dr. Cherkas's testimony at the penalty phase about defendant's "thinking disorder." The expert did not testify that defendant was unable to understand the proceedings or rationally assist in his defense. Nor did the expert's testimony, when considered with the aggregate evidence before the court, raise a reasonable doubt as to defendant's competence to stand trial. (See *People v. Ghobrial* (2018) 5 Cal.5th 250, 268-274; *People v. Halvorsen* (2007) 42 Cal.4th 379, 403.)

## E. Trial Court's Failure To Discharge Counsel Because of Alleged Conflicts

Defendant contends that his attorney labored under three actual conflicts of interest, any one of which obligated the trial court to discharge Hauser and appoint him new counsel. We disagree.

The state and federal Constitutions guarantee a criminal defendant the right to representation free from "conflicts of interest that may compromise the attorney's loyalty to the client and impair counsel's efforts on the client's behalf." (*People v. Mai*, *supra*, 57 Cal.4th at p. 1009.) To establish a denial of that right, the defendant must show that counsel labored under an

actual conflict that adversely affected counsel's performance and that, absent counsel's deficiencies, there is a reasonable probability the result would have been different. (*People v. Doolin* (2009) 45 Cal.4th 390, 417.) In determining whether an actual conflict adversely affected counsel's performance, we ask " 'whether counsel "pulled his punches," i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict. [Citation.] In undertaking such an inquiry, we are . . . bound by the record. But where a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' " (*Id.* at p. 418.)

Defendant claims Hauser suffered from three disabling conflicts. He fails to demonstrate that any actual conflict existed.

The first alleged conflict arose from defendant's attack on Hauser and subsequent threats against Hauser's family. Yet the court inquired about this potential conflict, and Hauser noted that he had represented difficult clients before. Hauser then assured the court the attack would not impair his ability to represent defendant: "I honestly believe that I can represent Mr. Johnson with equal vigor as if this had never happened." In concluding that no conflict existed, the trial court could reasonably have credited Hauser's representations. (See *People v. Hardy*, *supra*, 2 Cal.4th at p. 137.)

The second alleged conflict occurred when the prosecutor decided to rely on evidence of the assault as aggravating evidence at the penalty phase. Defendant claims that Hauser ought to have realized that he needed to withdraw as counsel so that he could testify as a witness to the assault on defendant's behalf. But an attorney must withdraw only when he or she knows or should know that he or she is or ought to be a *material* witness. (See *People v. Dunkle* (2005) 36 Cal.4th 861, 915.) Hauser's testimony was not necessary to establish the assault itself — and, indeed, the prosecution promised not to call Hauser to testify. Defendant suggests that Hauser, if called as a witness, might have testified that he did not fear defendant or that defendant was perhaps overcome by the emotion of beginning the trial at the time of the attack. But the latter is raw speculation: There is no evidence in the record that defendant was in emotional turmoil at the time he attacked Hauser, or that Hauser believed he was. As to the former, it is possible that Hauser, if called, might have testified that he did not fear defendant. But he could also reasonably believe that appearing as defendant's counsel, notwithstanding the attack, was a more effective way of making the same point. Indeed, Hauser told the court, "I can't think of a better advocate for Mr. Johnson than the victim of his own misdeed." And Hauser also sought to minimize the attack in his argument to the jury.

Defendant alleges the existence of a third conflict. This arose, according to defendant, from Hauser's acquiescence to the court's ruling requiring him — if he remained defendant's counsel — to refrain from arguing, "in the form of testimony or any other manner," certain mitigating aspects concerning the

assault.[5]  Defendant contends that Hauser thereby "sold" the right to argue mitigating circumstances relating to the assault "for the lucrative opportunity to continue to represent [defendant]."  On this record, though, there is no indication that Hauser saw his discharge as a "threat to [his] livelihood[], nor is there the slightest hint that thoughts of compensation, rather than sincere concern about protecting defendant's interest in avoiding a death judgment," influenced Hauser's decision to remain as counsel.  (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1009-1010, disapproved on another ground in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.)  Indeed, despite the court's ruling, Hauser showed the jury that he was able to continue as defendant's advocate.  He then argued that the incident was not a serious factor in aggravation and demonstrated merely defendant's frustration and mental impairment.  And, as explained in the preceding paragraph, Hauser would not have been a material witness for defendant at the penalty phase — so his inability to testify or otherwise offer more specific comment about the incident did not impair his ability to represent defendant.

Even if defendant had established a conflict, he has not shown that the conflict adversely affected counsel's performance.  To the contrary, counsel's decisions may have

---

[5]  The court singled out "one, your lack of fear of Mr. Johnson; two, the fact that you have elected to continue to represent Mr. Johnson despite the prior incidents; or, three, to refer to the attack in any way in argument such as the defendant must have just been overcome by emotion, having sat before the 400 people and realizing his jury trial was about to start, or it was his attempt to delay the proceedings and/or get another lawyer, or anything like that."

been the result of legitimate strategic and tactical choices. (See *People v. Perez* (2018) 4 Cal.5th 421, 437.) For example, Hauser could reasonably have believed that any objection to defendant's exclusion from the trial would have been futile; that defendant would have been unable to behave in front of the jury, to his detriment, if called to testify; that defendant's testimony from the prior trial, if read into the record, would not have been helpful or credible; and that he could be more effective as defendant's advocate rather than as a witness on what was only a minor piece of the evidence in aggravation in comparison to the murders themselves. (See *People v. Doolin, supra,* 45 Cal.4th at p. 418.)

Finally, defendant was not denied any constitutional or statutory right when the court inquired into Hauser's potential conflict in defendant's absence. As discussed earlier, defendant forfeited his right to be in the courtroom by his own misconduct. Defendant could have listened to the proceedings with a speaker, but he repeatedly declined to do so. Defendant cannot fairly complain that he lacked input into the discussions surrounding counsel's alleged conflicts, when it was defendant's own decision to separate himself from the proceedings that deprived him of the opportunity.

## F. Huggins's Volunteered Statement That Defendant "Had Already Beat Two Cases Like This"

Hightower's half-brother, Robert Huggins, was the only witness who testified at trial that defendant shot Faggins and Hightower. Huggins did not report to the police what he had seen until a few months after the murders, when he was arrested on an unrelated charge. Near the end of Huggins's direct examination, the prosecutor asked why Huggins had

allegedly told his girlfriend and his stepfather what he saw but did not tell police. Huggins replied, " 'Cause he [defendant] was still running around on the streets." When the prosecutor asked why Huggins was worried about that, Huggins explained, "He had already beat two cases like this already."

The defense immediately objected to this last response and, at sidebar, asked for a mistrial. Hauser added that Huggins's statement would also have prejudicial effects at any penalty trial. The trial court denied the request for a mistrial and proposed to admonish the jury to disregard Huggins's response. The trial court rejected codefendant's request to voir dire the jury to determine their ability to disregard the comment, reasoning that such questioning "would be creating a bigger problem for Mr. Hauser's client." Hauser agreed. Because some new witnesses had just arrived at court, the trial court took them out of order. Later that same day, after those witnesses had testified, the trial court reminded the jury about the pending objection to Huggins's testimony. The court stated that it was sustaining the objection and striking the response: "So you will disregard that answer."[6] The last remaining question and answer, the court reminded the jury, was "something to the effect of why hadn't he contacted the police, and he said because C.J. was still on the streets."

---

[6] Immediately prior to this admonition, the trial court referred to its earlier instruction that "whenever I order anything stricken by way of testimony, it's not in evidence; and you're not to consider it for any purpose. As a matter of fact, you're to treat it as though you never even heard it." The jury collectively responded that it remembered that instruction and would have no difficulty following it.

Defendant contends the court's remedy was insufficient to dispel the prejudice from Huggins's response. He believes the trial court instead should have granted a mistrial. A court should grant a mistrial " 'only when a party's chances of receiving a fair trial have been irreparably damaged.' " (*People v. Peoples* (2016) 62 Cal.4th 718, 802.) This generally occurs when " ' " 'the court is apprised of prejudice that it judges incurable by admonition or instruction.' " ' " (*People v. Harris* (2013) 57 Cal.4th 804, 848.) We review the trial court's refusal to grant a mistrial for abuse of discretion. (*People v. Williams* (2016) 1 Cal.5th 1166, 1187.)

No abuse of discretion appears. Huggins testified, without objection, that his reluctance to implicate defendant earlier was due to the circumstance that defendant "was still running around on the streets." The unstated (but self-evident) implication was that Huggins was afraid that defendant — who had already killed Faggins and Hightower — might retaliate if Huggins were to snitch to police, and that defendant was in a position to carry out such retaliation. Huggins continued to rely on his fear of defendant, even after defendant had been arrested, to explain why he declined to inculpate defendant at the preliminary hearing: Huggins had been placed in a lockup cell with defendant and codefendant on a regular basis, at which time defendant had asked him, in front of codefendant and two dozen other inmates, "why'd I [Huggins] say all the stuff I said about him." Consequently, the evidence that Huggins feared defendant was quite strong, even leaving aside the reference to defendant having beaten "two cases like this already." (See *People v. Williams* (1997) 16 Cal.4th 153, 211-212.)

Moreover, Huggins's volunteered statement was brief and unaccompanied by anything that might have tended to

corroborate it or otherwise demonstrate its truth. Nor did the prosecutor mention it in the guilt or penalty phases. At most, the jury might have concluded that *Huggins* believed what he said. But *that* inference could easily have been — and was — dispelled by the admonition the jury received. To the extent the jury — despite the instruction to disregard Huggins's statement — might have relied on it to infer that Huggins had been reluctant to testify against defendant out of fear, it was cumulative of the other evidence that Huggins was afraid. Accordingly, the potential prejudice at both the guilt and penalty phases from Huggins's volunteered statement was not of the sort that could not be cured by an admonition or instruction. (See *People v. Williams*, *supra*, 16 Cal.4th at p. 211 [rejecting a claim of incurable prejudice where a witness testified she had received telephone calls " 'that if I testified I would be killed,' " the statement was stricken, and the jury admonished]; *People v. Osband* (1996) 13 Cal.4th 622, 675.)

### G. Rochelle Johnson's Hearsay Statement That "C.J. Didn't Have To Kill Him"

Codefendant's girlfriend Rochelle Johnson gave conflicting statements as to whether she had been at the party at the time of the shooting and whether she knew who committed the shootings. She told Detective Vena at the scene that the music stopped when Hightower left the party, that everybody went outside, and that she saw Hightower lying in the front seat of his girlfriend's vehicle only after he had been shot. At trial, though, she testified that the party was still going on when she left around 11:30 p.m., that after she got home she heard a lot of screaming, and that someone came to her door seeking her nursing skills because of an "accident." She then ran out and found Hightower sitting in a car, "full of blood."

Rochelle told Detective Vena that she did not know who the shooter was. But her brother, Leonard Greer, testified that she had told him as she was leaving the scene, "They didn't have to kill him. They didn't have to kill him," and then revised it, over defendant's hearsay objection, as "C.J. didn't have to kill him." Defendant renews his hearsay objection here. We find that the statement was admissible as a prior inconsistent statement. (Evid. Code, § 1235.)

An out-of-court statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted, so long as the witness has been given an opportunity while testifying to explain or deny the statement or is still subject to recall. (Evid. Code, § 1235; see *People v. Chism* (2014) 58 Cal.4th 1266, 1294.) Rochelle's statement to her brother near the scene of the murder that "C.J. didn't have to kill him" was inconsistent with her trial testimony that she never told anyone that defendant was involved in the shootings and that she did not see Greer on her way back home after the shootings or talk to him about what had happened.

Defendant argues that even if the hearsay statement was inconsistent with Rochelle's trial testimony, it should not have been admitted because there was insufficient evidence that she had personal knowledge of the shooter's identity. (See Evid. Code, §§ 403, subd. (a)(2) [proponent of evidence has the burden of establishing a witness's personal knowledge], 702; see generally *People v. Cortez* (2016) 63 Cal.4th 101, 123-124 ["California courts have extended this personal knowledge requirement to statements of hearsay declarants"].) A trial court may exclude a witness's testimony for lack of knowledge " '*only if no jury could reasonably find* that [the witness] has such knowledge.' " (*People v. Anderson* (2001) 25 Cal.4th 543,

573.)  Once that low threshold is satisfied, " 'it is for the jury to decide whether the witness's perceptions and recollections are credible.' " (*Cortez*, at p. 124.)  Although the evidence supporting an inference of Rochelle's personal knowledge may have been thin, the trial court did not abuse its discretion in admitting her hearsay statement.

Rochelle's statements about whether she was present at the time of the shooting were vague and inconsistent.  She testified that she arrived at the party around 7:30 p.m.  It was general knowledge that Faggins was in danger, which was why "[e]verybody at the party was trying to get [him] to leave."  Faggins, Hightower, and Lewis left the party around the same time.  Rochelle told Detective Vena that at that point, the music stopped and "everybody went outside."  According to Newton, defendant and Betton walked down to the sidewalk "where everybody else at" to attack and then shoot Faggins.  Rochelle told Vena she ran down to 99th Place from the party to find Hightower had been shot.  At trial, though, Rochelle provided a different account.  She denied being at the party at the time of the shooting and claimed instead that she had been at home, two buildings away, in her bathroom, until somebody knocked on her door and told her what had happened.  She did not recall giving Vena a different account of her whereabouts.

Other witnesses, however, placed Rochelle right at the murder scene.  Lewis reportedly told Huggins that Rochelle was "near" the car at the time Hightower was shot.  Lewis also told him that Rochelle "knew more about the incident than she was talking about."  This evidence, if credited, supported an inference that Rochelle's statement about the shooting was based on personal knowledge.

Greer's testimony likewise tended to show that she was at the murder scene. Greer testified that he was walking towards Rochelle's apartment when he heard gunfire and ran to see what the shooting was about. It took him less than a minute to notice the crowd gathered at 99th Place. About 30 seconds to a minute after defendant and Betton ran off, he saw Rochelle walking towards him from the murder scene. She was crying and covered in blood. When she said, "They didn't have to kill him. C.J. didn't have to kill him," the two embraced. Now *perhaps* it was possible that someone left the scene immediately after the shootings, ran to Rochelle's apartment, got her attention and explained what happened — and Rochelle then came out of her bathroom, made it to the murder scene, began and completed an unsuccessful attempt to administer CPR to Hightower, collapsed on the sidewalk in tears for several minutes, and started walking back home — all within the brief period it took Greer to approach the scene after hearing gunshots. But the record did not *compel* that conclusion. A reasonable juror could instead have concluded that Rochelle went outside along with everyone else at the party, witnessed the murders, offered aid immediately to Hightower, and met up with Greer as she left the scene.

It is true that each of these alleged eyewitnesses suffered from substantial attacks on their credibility. Greer was impeached with numerous felonies. He lied to police about a number of facts, including whether he had been at the party, whether he witnessed the murders, and what motivated the murders. Huggins had given inconsistent accounts to police and under oath, in addition to being impeached with his prior misdemeanor spousal abuse. And at trial, both Lewis and Newton repudiated their prior statements. But it was for the

jury to decide which account to believe. (See *People v. Zilbauer* (1955) 44 Cal.2d 43, 48-49.) A reasonable juror could have credited the testimony tending to show that Rochelle had witnessed the murders. Accordingly, defendant's challenge to the admission of Rochelle's hearsay statement must fail.

## H. Asserted Exclusion of Evidence That Tyrone Newton Expected a Benefit from Making Statements Inculpating Defendant

Tyrone Newton told police in a videotaped interview that defendant planned and committed the murders of Faggins and Hightower. At trial, though, Newton insisted that his videotaped statement, which was taken while he was in custody for cocaine possession, was a lie. According to Newton's trial testimony, an officer promised to "drop" the cocaine charge in exchange for information about the murders. Newton claimed not to know anything about the murders, but had just "followed along" with the story provided to him by police during the time he was in custody for cocaine possession. Newton explained that, on prior occasions, he had offered information to the police in exchange for release from custody.

Detective Waters had conducted the videotaped interview. She denied promising Newton anything in exchange for his statements.

To corroborate Newton's expectation of favorable treatment in exchange for statements about the murders, codefendant's counsel pointed out that Newton had been released a short time after the videotaped interview and was never prosecuted for cocaine possession. Counsel also elicited admissions from Detective Waters that, during their interview, Newton said something to the effect of "the more y'all get me off

y'all line, the happier I will be" and talked about the fact that he had previously been an informant for a detective named Barber. But when counsel sought to follow up on this line of questioning — by asking Detective Waters whether Newton had said "that he supplied information to Detective Barber on other occasions" — the trial court sustained the People's relevance objection. At sidebar, codefendant's counsel explained that Newton's history of involvement with Detective Barber would support the inference that Newton was hoping to make a deal with Detective Waters: "In the tape, Your Honor, Mr. Newton tells this detective that he provided Detective Barber with information whenever he wanted to and that Detective Barber, on the other hand, would help him. And he talks about the fact that he got caught with a lot of drugs on one occasion and how Detective Barber helps him. [¶] So clearly it goes to the fact that Mr. Newton is talking to this detective — at least the inference is that he's hoping to get some kind of deal, because he was in custody at the time that he spoke to this detective." Defendant's counsel joined in the offer of proof. The trial court suggested that this new line of inquiry would be confusing to the jury, because it referred to a part of the videotape they had not seen and for which they had not been given a transcript. When codefendant's counsel said he intended to call Newton as his own witness to address those parts of the interview, the court responded, "Well, for right now, the objection is going to be sustained." Codefendant's counsel did subsequently recall Newton to the stand — and played portions of the videotape — yet did not further explore Newton's relationship with Detective Barber or his expectation of similar favors from Detective Waters.

Defendant claims the trial court erred in barring the defense from offering certain evidence of Newton's motivation in making the videotaped statement and thereby violated his Sixth Amendment rights. But it is not clear the trial court actually prevented either defendant from presenting the desired excerpts of the interview. True, the trial court expressed skepticism about piecemeal presentation of new videotaped excerpts during Detective Waters's testimony, when the videotape had not been cued to the relevant portion and a transcript had not been provided to the jury. Based on that concern, the court sustained the objection "for right now." Codefendant then offered additional videotaped excerpts (and a transcript) when Newton was recalled to the stand, but never tried to include the excerpts concerning Detective Barber. By failing to press for a final ruling, defendant forfeited the claim. (See *People v. Holloway* (2004) 33 Cal.4th 96, 133; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1181.)

In any event, the trial court did not abuse its discretion in excluding the evidence described in codefendant's offer of proof. Additional evidence of Newton's history with Detective Barber would have been cumulative of what the defense had already elicited from Newton and Detective Waters. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 999.) And by confirming that Newton told her "the more y'all get me off y'all line, the happier I will be," Waters's testimony tended to show that Newton was indeed interested in making a deal with her. So defendant already had what he needed for "making real to the jury that the atmosphere under which Newton's statements were made was a barter situation." Indeed, the prosecutor conceded in argument that Newton "probably was expecting something." Because the jury had a full understanding of

Newton's potential motivation, the trial court's ruling did not violate defendant's constitutional or statutory rights. (See *People v. Quartermain* (1997) 16 Cal.4th 600, 624.)

## I. Error in Failing To Instruct the Jury To View Defendant's Out-of-court Oral Statements with Caution

Newton claimed during his videotaped police interview that he was present when defendant "was talking about killing" Faggins and Hightower. According to Newton, defendant announced, "[W]e're getting rid of all the snitches" and, pointing at the victims, said, "[W]e can do them right here and right now." At trial, Newton repudiated his videotaped statements and testified that he had been elsewhere at the time of the shootings. It was left to the jury to decide which version of Newton's testimony to believe and whether defendant ever made these statements.

Until recently, we had imposed on trial courts a sua sponte duty to instruct the jury that a defendant's oral admissions should be viewed with caution. (See *People v. Wilson* (2008) 43 Cal.4th 1, 19; CALJIC No. 2.71.7.) In *People v. Diaz* (2015) 60 Cal.4th 1176 (*Diaz*), though, we determined that the instruction need be given only on request. (*Id.* at p. 1189.) Because jurors must now be instructed — and were instructed here — with the "general instructions on witness credibility" (*id.* at p. 1189; see CALJIC No. 2.20), the cautionary instruction for oral admissions no longer qualified as "one of the general principles of law upon which a court is required to instruct the jury in the absence of a request" (*Diaz*, at p. 1189). We also concluded that defendants should be allowed to decide whether the instruction would be in their interests, rather than require the trial judge to give the instruction in every case, since such oral statements

may sometimes include "both incriminating and exculpatory elements." (*Id*. at p. 1193.) In rejecting the People's argument that the instruction never be given, even on request, we observed that "the [cautionary] instruction may be useful to the defense in highlighting for the jury the need for care and caution in evaluating evidence of the defendant's statements." (*Id*. at p. 1189.)

The trial court here failed to instruct the jury that it should consider defendant's oral statements with caution. The Attorney General concedes that the trial court erred in failing to instruct the jury in accordance with CALJIC No. 2.71.7[7] or some equivalent instruction. Yet his concession predated our decision in *Diaz*, which declared that the instruction need be given only on request. We therefore consider whether our *Diaz* decision, which was issued well after the trial in this case, should be given retroactive effect — and whether defendant was therefore obligated to request a cautionary instruction if he desired one. We conclude the answer to both questions is no. The law in effect at the time of trial was clear: A trial court had the duty to instruct the jury sua sponte to view a defendant's oral admissions with caution. The required instruction dated from 1872 and was codified in the Code of Civil Procedure, former section 2061, subdivision 4. (See *Diaz*, *supra*, 60 Cal.4th at p. 1184.) Although the Legislature repealed that provision when

_____

[7] At the time of trial, CALJIC No. 2.71.7, as given, provided: "Evidence has been received from which you may find that an oral statement of intent, plan, and motive was made by the defendant before the offense with which he is charged was committed. [¶] It is for you to decide whether the statement was made by the defendant. [¶] Evidence of an oral statement ought to be viewed with caution."

it adopted the Evidence Code in 1965, we subsequently held that the repeal had no effect on a court's obligation to give the instruction contained in the former statute. (*People v. Beagle* (1972) 6 Cal.3d 441, 455, fn. 4.) And this court reaffirmed a trial court's sua sponte duty to give the cautionary instruction just a year before the trial in this case. (See *People v. Carpenter* (1997) 15 Cal.4th 312, 392-393.) Because defendant would have had no reason to anticipate that the burden was on him to request the instruction, we conclude that the *Diaz* rule should be applied only prospectively. (See *People v. Simon* (2001) 25 Cal.4th 1082, 1108 [new rule requiring a defendant to object to venue before trial "should be applied only prospectively"].) Accordingly, we accept the Attorney General's concession that the trial court erred under state law in failing to give the instruction. (See *Diaz*, *supra*, 60 Cal.4th at p. 1195 ["We apply the standard for state law error . . . . Failure to give the cautionary instruction is not a violation of federal due process . . . ." (citation omitted)].)

But ultimately, the error was harmless. The jury was fully aware of its duty to resolve whether defendant made these statements. After viewing Newton's videotaped statement purporting to describe what defendant said, the jury saw Newton testify under oath that he had falsely inculpated defendant and Betton in an effort to secure a favorable resolution of a pending drug charge. Moreover, Newton's videotaped statement was riddled with factual errors: He told Waters that the murders occurred during the daytime, around 4:00 or 5:00 p.m., on September 25, 1996 — but they actually occurred around 10:00 p.m., well after dark, the next day. He said the shootings took place on 97th Street, but they actually happened on 99th Place. He said that defendant shot both victims with the same gun — but the forensic analysis showed

they had been shot with different guns. He said that the shooter reached inside the car to shoot Hightower, but that was contradicted by the medical examiner and by Detective Vena. At trial, Newton attributed the discrepancies in his videotaped statement to his failure to attend the party. Accordingly, before the jury could credit Newton's videotaped account of defendant's statements, it necessarily had to decide which version of Newton's account should be believed.

So we do not dispute that the jury needed to determine whether defendant made the statements described by Newton. But the other jury instructions made that reasonably apparent, and alerted the jury of the need to carefully consider Newton's account. In particular, the jury was instructed about the significance of a witness's prior consistent and inconsistent statements (CALJIC No. 2.13), discrepancies in a witness's testimony or between the witness's testimony and that of others (CALJIC No. 2.21.1), a witness's willfully false statement in material part (CALJIC No. 2.21.2), conflicting testimony (CALJIC No. 2.22), the believability of a witness convicted of a felony (CALJIC No. 2.23), and a witness's credibility in general (CALJIC No. 2.20). Under these circumstances, it is not reasonably likely or possible that the error in omitting a cautionary instruction affected the outcome at the guilt or penalty phases. (See *Diaz, supra,* 60 Cal.4th at pp. 1196-1197; *People v. Dickey* (2005) 35 Cal.4th 884, 906-907.)

## J. Challenge to the Instruction That Defendant Voluntarily Absented Himself from the Proceedings

The trial court instructed the venire not to consider defendant's absence from the trial: "[T]he defendant Johnson will not be present for these proceedings. The court is

instructing [] that you are not to speculate as to the reasons for his absence, nor is this a matter which in any way can affect you or your verdict in this case." No one raised a hand in response to the court's inquiry whether anyone would be unable to follow this instruction. At the end of trial, the court instructed the jury that defendant "has voluntarily absented himself from these proceedings. This is a matter which must not in any way affect you in this case. [¶] In your deliberations, do not discuss or consider this subject. It must not in any way affect your verdicts or findings you may be asked to make in connection with your verdicts." The trial court overruled the defense objection to the word "voluntarily," reasoning that "it's been his choice on a daily basis to never even listen to this case" and that "he, by his conduct, waived his right to testify" and to be present in court.

Defendant renews his claim that the word "voluntarily" injected an untrue and unnecessary concept into the instruction. He relies on the trial court's acknowledgement that defendant probably would want to be present in the courtroom. We need not decide whether a defendant who knowingly and voluntarily disrupts the proceedings such that the trial cannot continue in his presence has voluntarily absented himself. (But see *Maxwell v. Roe, supra*, 606 F.3d at p. 570; *U.S. v. Hemsi* (2d Cir. 1990) 901 F.2d 293, 296.) We find instead that even if the word should have been omitted, the jury did not construe the instruction to his detriment. The jurors were instructed — twice — that defendant's absence must not "in any way" affect their consideration of the case or their verdicts. The jury was also warned not to consider or discuss the topic in its deliberations. We presume the jury followed those instructions. (See *People v. Young* (2005) 34 Cal.4th 1149, 1214.)

We also reject defendant's claim that the court's instruction to disregard defendant's absence was undermined by the standard flight instruction (CALJIC No. 2.52), which, as given, provided: "The flight of a person immediately after the commission of a crime *or after he's accused of a crime* is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide." (Italics added.) Defendant proposes that the jury, in reliance on the italicized language and his voluntary absence from trial, may have inferred (1) that he fled to escape trial, and (2) that they could consider that flight in deciding his guilt. But there was no evidence that defendant fled after being accused — nor did the prosecutor make any such argument to the jury. So any claim that the jury might have thought he fled would be entirely speculative. After all, the jury would have understood that it could consider such flight only "if proved" — and it was not proved here.

Defendant is correct that the italicized phrase in CALJIC No. 2.52 was unnecessary in this case and could have been deleted. But the jury was instructed to "[d]isregard any instruction which applies to facts determined by you not to exist" and warned "not [to] conclude that because an instruction has been given that I'm expressing an opinion as to the facts." So there was little risk that the jury misapplied the instruction to defendant's detriment. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1153-1154; *People v. Carrera* (1989) 49 Cal.3d 291, 314.)

*Commonwealth v. Muckle* (Mass.App.Ct. 2003) 797 N.E.2d 456, on which defendant relies to suggest that the standard instruction may lead a jury to infer flight from the defendant's

absence in some circumstances, is distinguishable. In that case, the defendant failed to appear at trial following the second day's lunch break. (*Id*. at p. 459.) The trial court gave the standard instruction on flight for the sole purpose of enabling the prosecution to argue that his absence from the trial "reflected a consciousness of guilt" — even though the evidence before the jury did not establish the voluntariness of the defendant's absence or any other type of flight. (*Id*. at p. 461; cf. *People v. Snyder* (1976) 56 Cal.App.3d 195, 199 [upholding the flight instruction where the defendant, who was free on bail, absconded after the first day of trial].) In fact, the *Muckle* court determined that "the consciousness of guilt instruction should not have been given at all." (*Muckle*, at p. 462.) Here, by contrast, the flight instruction was justified by evidence that defendant fled the murder scene: Greer testified that he saw defendant and codefendant running from the area where the murders occurred. Moreover, the prosecution in this case never argued that defendant's absence from the trial constituted flight or reflected a consciousness of guilt, and the jury was instructed not to consider defendant's absence from trial "in any way." We therefore see no reasonable likelihood that the jury considered defendant's absence from trial as evidence of his guilt.

## K. Failure To Instruct the Jury That It Could Consider Huggins's Misdemeanor Conduct in Evaluating His Credibility

At trial, Huggins admitted he had been convicted of misdemeanor spousal abuse in 1997. The trial court instructed the jury in accordance with CALJIC No. 2.20 that "[i]n determining the believability of a witness, you may consider anything that has a tendency to prove or disprove the truthfulness of the testimony, including, but not limited to . . . a

witness's prior conviction of a felony." But the court did not append the standard language allowing the jury also to consider "[p]ast criminal conduct of a witness amounting to a misdemeanor." (CALJIC No. 2.20 (6th ed. 1996).)

Even assuming that the trial court had a sua sponte duty to include the reference to misdemeanor conduct (see *People v. Contreras* (2013) 58 Cal.4th 123, 157), the instructions, viewed as a whole, nonetheless allowed the jury to consider any evidence of Huggins's moral turpitude, including his misdemeanor spousal abuse. CALJIC No. 2.20, quoted above, instructed the jury to consider everything that has a bearing on a witness's credibility, and its list of suggested factors explicitly stated it was not exhaustive. (See *People v. Horning* (2004) 34 Cal.4th 871, 911.) So it is not reasonably likely that the jury believed it was precluded from considering Huggins's misdemeanor conduct in evaluating his credibility.

## L. Instruction Concerning Juror Misconduct (CALJIC Former No. 17.41.1)

The trial court instructed the jury that "[t]he integrity of a trial requires that jurors at all times during their deliberations conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on penalty or punishment or any other improper basis, it is the obligation of the other jurors to immediately advise the court of the situation." (CALJIC former No. 17.41.1) Although we disapproved of this instruction as an exercise of our supervisory power in *People v. Engelman* (2002) 28 Cal.4th 436, we acknowledged that the instruction does not infringe on a defendant's right to a jury trial, a unanimous verdict, or due process. (*Id.* at pp. 439-440.) Defendant cites nothing in the

record indicating that the instruction nonetheless affected the deliberations in the guilt or penalty phases, nor does he offer a persuasive reason to reconsider our conclusion in *Engelman*. (See *People v. Banks*, *supra*, 59 Cal.4th at p. 1171; *People v. Brown* (2004) 33 Cal.4th 382, 400-401.) Accordingly, we reject the claim.

## M. Instructions Concerning Reasonable Doubt

Defendant contends that certain instructions — CALJIC Nos. 2.01, 2.02, and 8.83.1 — undermined the requirement of proof beyond a reasonable doubt, and that certain other instructions — CALJIC Nos. 2.21.2, 2.22, 2.27, 2.51, and 8.20 — individually and collectively diluted the reasonable doubt standard. Defendant acknowledges that we have repeatedly rejected similar challenges. (See *People v. Cage* (2015) 62 Cal.4th 256, 286; *People v. Friend* (2009) 47 Cal.4th 1, 53.) We reject his claim too.

## N. Judicial Bias

Defendant contends that the trial court was biased against him. As evidence, he submits a "grab bag" of the court's rulings. Yet defendant never objected to the vast majority of these rulings — and not once on the ground of bias — nor did he ever move to disqualify the court on the ground of bias. A defendant may not go to trial before a judge, betting on a favorable result and failing to raise objections of bias, and then argue on appeal that the judge was biased. (*People v. Johnson* (2015) 60 Cal.4th 966, 978-979, quoting *People v. Rodriguez* (2014) 58 Cal.4th 587, 626.) So we deem the claim of judicial bias to be forfeited. (See *Johnson*, at pp. 978-979; *Rodriguez*, at p. 626; *People v. Farley* (2009) 46 Cal.4th 1053, 1110; *People v. Guerra* (2006) 37 Cal.4th 1067, 1111, overruled on another ground in *People v. Rundle*

(2008) 43 Cal.4th 76, 151.)[8]  Even if the court's rulings were erroneous — a question we do not reach — it would not in itself establish that the court was biased.  (See *People v. Pearson* (2013) 56 Cal.4th 393, 447.)  We likewise note that defendant's willingness to let the entire trial pass without articulating an appropriate objection "strongly suggests" his claim is without merit.  (*Guerra*, at p. 1112.)

## O.  Penalty Phase Instructions

The trial court declined to give defendant's requested instruction informing the jury that it "was permitted to consider pity, sympathy or mercy for the defendant in deciding whether to give life without parole or death."  The court pointed out that CALJIC No. 8.85 adequately covered the topic.  Factor (k) in that instruction, as it was given in this case, directed the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime . . . and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."  Accordingly, the trial court did not err.  (See *People v. Ervine* (2009) 47 Cal.4th 745, 801; *People v. Berryman* (1993) 6 Cal.4th 1048, 1098.)

The court also denied defendant's request to instruct the jury that "the sentence of death is to be considered a worse sentence than that of life without the possibility of parole, even though you may personally disagree."  As we have previously held, the other jury instructions, particularly CALJIC No. 8.88, as well as the penalty trial itself make clear that death is the

---

[8]     Defendant was well aware of the procedure to disqualify a judge for bias.  He had filed a motion to disqualify a different judge prior to his first trial, but the motion was denied.

most severe penalty. (See *People v. Contreras*, *supra*, 58 Cal.4th at p. 170.) Once again, the trial court did not err.

### P. Cumulative Error

Defendant contends that the cumulative effect of the errors in this case was so prejudicial as to require reversal of the judgment. But the only fact finder-related issues we have resolved on harmless error grounds are the trial court's failure to instruct the jury to view Newton's account of defendant's out-of-court statements with caution, and its passing assertion that defendant had "voluntarily absented" himself in the course of instructing the jury not to allow his absence to affect their decisionmaking in any way. Neither of these errors or potential errors, nor their cumulative effect, warrants reversal. (See *People v. Perez*, *supra*, 4 Cal.5th at p. 466.) Nor does the trial court's asserted error in considering defendant's threats against Hauser and his family in deciding whether to exclude defendant from the courtroom.

### Q. California's Death Penalty Statute

Defendant articulates several challenges to the constitutionality of California's capital sentencing scheme, but concedes these have each been "consistently rejected" by this court. Defendant's arguments do not persuade us to reconsider our precedent. (*People v. Winbush* (2017) 2 Cal.5th 402, 488.) The state's death penalty scheme does not violate the federal Constitution by failing to adequately narrow the class of offenders eligible for the death penalty (see, e.g., *Winbush*, at p. 488); apply a limiting construction to section 190.3, factor (a) (see, e.g., *People v. Bennett* (2009) 45 Cal.4th 577, 630-631); require jurors to find aggravating factors (other than § 190.3, factor (b) or (c) evidence) beyond a reasonable doubt (see, e.g.,

*People v. Rangel* (2016) 62 Cal.4th 1192, 1235); assign the burden of proof to the prosecution or inform the jury there was no burden of proof (see, e.g., *Bennett,* at pp. 631-632); require jurors to find unadjudicated criminal activity or other aggravating factors unanimously (see, e.g., *Winbush,* at p. 489; see also *People v. Thompson* (2016) 1 Cal.5th 1043, 1130); define what it means for the aggravating factors to be "so substantial" in comparison to the mitigating factors (*Thompson,* at p. 1128); instruct the jury to select the "appropriate" penalty (*People v. Farley*, *supra,* 46 Cal.4th at p. 1133), to return a verdict of life if the mitigating factors outweighed the aggravating factors (see, e.g. *People v. Carrington* (2009) 47 Cal.4th 145, 199), and to presume that the appropriate penalty is life (see, e.g., *People v. Henriquez* (2017) 4 Cal.5th 1, 46); instruct the jury that there was no burden of proof as to mitigating factors and that such factors need not be found unanimously (see, e.g., *Winbush,* at p. 490); require written findings from the jury as to aggravating and mitigating factors (see, e.g., *ibid.*); or require either "intercase proportionality review" or "the disparate sentence review that is afforded under the determinate sentence law" (*People v. Williams*, *supra,* 1 Cal.5th at p. 1205). Nor did the trial court err by instructing the jury about the aggravating and mitigating factors using a unitary list (see, e.g., *People v. Myles* (2012) 53 Cal.4th 1181, 1222), by using the word "extreme" in CALJIC No. 8.85 (see, e.g., *Myles,* at p. 1223); or by telling jurors to consider section 190.3 factors "if applicable" (see, e.g., *People v. Maury* (2003) 30 Cal.4th 342, 439).

Defendant also concedes that we have repeatedly held that certain procedural distinctions between capital and noncapital sentences are sufficiently justified (see, e.g., *People v. Virgil* (2011) 51 Cal.4th 1210, 1290 [" '[C]apital and noncapital

defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws' "]), and that arguments based on international law along the lines of what defendant advances in this case are not a basis to invalidate death sentences that are lawful under domestic law. (See, e.g., *People v. Jennings* (2010) 50 Cal.4th 616, 690.) We do the same today.

### III.

We affirm the judgment in its entirety.

**CUÉLLAR, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**RAYE, J.**[*]

---

[*] Administrative Presiding Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Johnson

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S075727
**Date Filed:** December 27, 2018

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** John J. Cheroske


_____

**Counsel:**

Michael J. Hersek and Mary K. McComb, State Public Defenders, under appointment by the Supreme Court, Joseph E. Chabot, Mai Linh Spencer and Nina Wilder, Deputy State Public Defenders, for Defendant and Appellant.

Edmund G. Brown, Jr., and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Pamela C. Hamanaka and Lance E. Winters, Assistant Attorneys General, Sharlene A. Honnaka, Jaime L. Fuster and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Nina Wilder
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607
(510) 267-3300

Marc A. Kohm
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 269-6175